UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TRAVIS JAMES,

                            Plaintiff,

        v.

DANA GAGE, *Medical Director F.H.S.D.*;
B. FURCO, *Nurse-Administrator*;
ADEKNAMI ALBERT, *Nurse*; BIGAUD,
*Provider*; LIEUTENANT THAYER,

                            Defendants.

No. 15-CV-106 (KMK)

OPINION AND ORDER

Appearances:

Travis James
Ossining, NY
*Pro Se Plaintiff*

Janice Powers, Esq.
Office of the New York State Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Pro se Plaintiff Travis James ("Plaintiff") filed the instant Amended Complaint

("Amended Complaint"), pursuant to 42 U.S.C. § 1983, against Medical Director Dana Gage

("Gage"), Nurse Barbara Furco ("Furco"), Nurse Albert Adeknami ("Adeknami"), provider

Bigaud ("Bigaud"), and Lieutenant Thayer ("Thayer") (collectively, "Defendants").  (Am.

Compl. (Dkt. No. 39).)  Plaintiff alleges that Defendants violated his rights under the Eighth and

Fourteenth Amendments because they were deliberately indifferent to his need for hip

replacement surgery and punished him for false misbehavior reports.  (*Id.*)

Before the Court is Defendants' Motion To Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(c). (*See* Notice of Mot. To Dismiss (Dkt. No. 63).) For the following reasons, Defendants' Motion is granted in part and denied in part.

A. Factual Background

The following facts are drawn from Plaintiff's Amended Complaint, (Am. Compl.), and Plaintiff's opposition to the Motion To Dismiss, (Pl.'s Reply to Defs.' Summ. J. Mot. ("Pl.'s Mem.") (Dkt. No. 69)), both of which include attached exhibits, and are taken as true for the purpose of resolving the instant Motion.[1] During the time of the alleged events, Plaintiff was a convicted prisoner at Sing Sing Correctional Facility in Ossining, New York ("Sing Sing"). (Defs.' Mem. of Law in Supp. of Mot. To Dismiss ("Defs.' Mem.") (Dkt. No. 80) Ex. A ("FAC") 1.)

In 2004, Plaintiff had hip replacement surgery. (*Id.* at 4.) Ten years later, in February 2014, he began experiencing "extreme pain" in the hip replacement. (*Id.*) Plaintiff therefore "put down for emergency sick call to have his hip evaluated," although it is unclear when he did this. (*Id.*) Plaintiff alleges that, at some point prior to March 8, 2014, he "was seen by . . . Furco, who stated that there was nothing wrong with him and sent [P]laintiff back to his cell

---

[1] Both of Plaintiff's submissions were filed as multiple documents, some of which are exhibits which restart the ECF pagination. For ease of reference, when citing to the Amended Complaint, the Court will cite to the version provided as an exhibit to Defendants' Memorandum, because it contains consistent pagination for the entire document, labelled PTLF <number> in the bottom right corner. (Defs.' Mem. of Law in Supp. of Mot. To Dismiss (Dkt. No. 80) Ex. A ("FAC").) The Court notes that this version of Defendants' Memorandum filed on the docket is redacted, but an unredacted version, including all of the exhibits relevant to this Motion, was filed under seal. (*See* Dkt. (entry for May 11, 2018).) When citing to the exhibits in Plaintiff's opposition, the Court will cite to the ECF-generated page numbers, which re-start with each exhibit. (*See* Pl.'s Mem.)

without any medication or medical attention and said [']you just want to sue['].'' (*Id.*)

According to a medical record attached to the Amended Complaint, Plaintiff was evaluated by

Bigaud on February 3, 2014; the "exam was unremarkable" and Plaintiff "had an x-ray which

showed no disruption of his hip prosthesis, but an ortho[pedist] consult was requested for further

evaluation." (*Id.* at 33.)[2] The orthopedist consult was scheduled for March 6, 2014. (*Id.* at 14.)

A medical note attached to the Amended Complaint also stated that Plaintiff was "seen at sick

call" on March 3, 2014, when he was "walk[ing] briskly and ris[ing] quickly from sitting

position without pain," although the note preparer's signature is illegible. (*Id.*)

Because he "continued to experience extreme pain which grew worse," Plaintiff "went

back to emergency sick call on [March 8, 2014]" around 10:30 or 11 am. (*Id.* at 4.) "Plaintiff

explained to . . . Furco that the pain had grown worse, after being evaluated," and told him "that

it was hard for [Plaintiff] to walk and his leg hurt[s] every time he stands on it." (*Id.*) Plaintiff

---

[2] This quote is taken from an email regarding a grievance Plaintiff filed that outlines his medical history at Sing Sing, although the sender, recipient, and date are redacted. (FAC 33.) Plaintiff attached this email to the Amended Complaint, so the Court will consider it. (*Id.*) *See Blue Tree Hotels Inv. v. Starwood Hotels & Resorts*, 369 F.3d 212, 217 (2d Cir. 2004) (permitting consideration of "any documents that are either incorporated into the complaint by reference or attached to the complaint as exhibits"). Although the Court normally accepts the allegations in a complaint as true at the motion to dismiss stage, this rule does not apply where a document attached to the complaint contradicts the plaintiff's allegations. *See Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002); *see also MBIA Inc. v. Certain Underwriters at Lloyd's*, 33 F. Supp. 3d 344, 353 (S.D.N.Y. 2014) ("Allegations in the complaint that are 'contradicted by more specific allegations or documentary evidence' are not entitled to a presumption of truthfulness.") (quoting *Kirkendall v. Halliburton, Inc.*, 707 F.3d 173, 175 n.1 (2d Cir. 2013)).

Defendants also request that the Court consider several other medical records that they attach to their Motion. (*See* Defs.' Mem. Ex. B.) Plaintiff submitted some of these records again as exhibits to his opposition to the Motion. (*See* Pl.'s Mem. Exs. A, B.) At this stage, the Court considers only the documents submitted by Plaintiff, and not any additional records contained only in Defendants' exhibits. However, the Court notes that many of these records are illegible or contain acronyms without any accompanying explanation of what they mean. (*See id.*)

alleges that he asked "Furco to please help him with some medication, cane and[/]or crutches," but Furco said "no I am not giving you anything; go back to your housing area." (*Id.*) However, the medical note from his visit states that Plaintiff laughed "I know I'm in trouble" because he missed his ortho consult on March 6, that Plaintiff was "able to sit/stand" without pain, and that he had another evaluation with Bigaud scheduled for March 10, 2014. (*Id.* at 14.)

"The pain became persistent and made it very difficult for [P]laintiff to stand up," so Plaintiff put in another emergency sick call. (*Id.* at 4.) On March 9, 2014, Plaintiff again complained about his hip, stating "You people are doing nothing for me," and asked to go to an outside hospital. (*Id.* at 15.) Plaintiff alleges that "Furco stated that there wasn't anything wrong with him and told the officer to remove [P]laintiff." (*Id.* at 4.) However, the medical note indicates that Plaintiff was removed because he "began yelling loudly at [Furco]," threatening to "write [her] up too, just like everybody else," and because it was a "non-medical emergency." (*Id.* at 15.) The note also states that Plaintiff had a "mild limp" and was "[ambulating] [full weight bearing]." (*Id.*)

On March 10, 21, 25, and 26, 2014, Plaintiff went to emergency sick call because he "continue[d] to experience extreme pain and difficulty standing and walking." (*Id.* at 4.) Plaintiff alleges he was "seen by Defendant Jane or John Doe and provider Bigaud, who provide[d] [P]laintiff with pain medication which did not help." (*Id.*) The medical notes for these visits show that on March 21, Plaintiff was provided ibuprofen and analgesic balm, another appointment was scheduled with a physician's assistant, his ortho appointment had been rescheduled, and an "MRO" was ordered. (*Id.* at 15.) On March 25, Plaintiff was seen by Bigaud "for hypertension" and a cane request form was completed. (*Id.* at 16.) The March 26 note is largely illegible, but it indicates Bigaud examined Plaintiff on March 25 and Plaintiff was

"given [a] call out" to see Bigaud again on March 26.  (*Id.*)

On March 30 and 31, 2014, Plaintiff again went to emergency sick call "and complained to . . . Furco that he was in extreme pain and could not stand or walk."  (*Id.* at 4.)  Plaintiff "asked for a cane and crutches to help him get around," but "Furco refused to provide him" with those items, stating that "[P]laintiff[']s complaints w[ere] a non[-]emergency and wrote this on the triage papers."  (*Id.*)  Specifically, the March 30 medical note indicates that Plaintiff stated he "saw the PA and he is not doing anything for me, I want a[n] MRI" and "a cane."  (*Id.* at 17.)  However, the evaluator—whose name is illegible but the Court will assume, to be consistent with Plaintiff's allegations, is Furco—determined that a "cane [was] not medically indicated at this time," and noted Plaintiff was to see Bigaud again the next day, remain on a prescription for naproxen and continue medical restrictions, and that he should return to the emergency facility if the situation worsens.  (*Id.*)  The March 31 medical note is largely illegible, but does state that Plaintiff came to the visit "on crutches," had been seen 12 times that month, and was "ambulatory ad lib"—in other words, able to walk when he chose to.  (*Id.*)

Plaintiff alleges that on April 4, 2014, "the pain was so intense that [P]laintiff was unable to walk and was escorted to emergency sick call in a wheelchair[]."  (*Id.* at 5.)  "Defendant Jane Doe refused [P]laintiff medical attention and made him walk back to his housing area in pain." (*Id.*)  However, the medical note for April 4 indicates that Plaintiff saw a doctor, Dr. Holder, on April 3 and was to see Bigaud that day.  (*Id.* at 17; *see also id.* at 18 (stating that "[Patient] just seen by PA Bigaud on 4-4-14.").)  Although the records do not identify Dr. Holder's specialty, the medical notes from April 4 indicate that Plaintiff saw an orthopedist, who recommended labs, a "bone scan for evaluation of loosening of prosthesis," and a "cane for ambulation."  (Pl.'s Mem. Ex. B at 3.)  Plaintiff was given a cane pass and labs were requested.  (*Id.*)  On April 6,

2014, Plaintiff alleges that "the pain became so unbearable that [P]laintiff had to come in a wheelchair and had to be admitted to the infirmary." (FAC 5.) While there, "[P]laintiff was provided with crutches to help him move around." (*Id.*) The medical note from April 6 indicates that a doctor was consulted and that Plaintiff was "to be admitted to [the] infirmary," "RN Abujaber [was] informed," and that Plaintiff was prescribed several medications, including clonidine, toradol, Tylenol, and ibuprofen. (*Id.* at 18.) A medical note dated April 11, 2014 indicated that Plaintiff was improving and "ambulating without complications." (*Id.*)

On April 13, 2014, Plaintiff alleges that he "went to emergency sick call two . . . times" and "was evaluated by Defendant Jane or John Doe." (*Id.* at 5.) "Plaintiff told Defendant that he had an operation 10 years ago, and the recent x-rays would show that his hip had shifted and that he needed a cane or crutches to move about." (*Id.*) The unnamed Defendant allegedly "stated that nothing [Plaintiff] was saying matter[ed] and that [P]laintiff is going back to his cell, [on] medical[] keeplock." (*Id.*; *see also id.* at 19 (medical note).) The medical note also states that a doctor ordered that Plaintiff get additional medications daily, "be reevaluated by" another physician's assistant, kept on medical keeplock, and not permitted to exercise. (*Id.* at 19.)

On April 14, 2014, Plaintiff again went to emergency sick call because he was "in extreme pain" and "asked Defendant Jane or John Doe for better medication because what he was getting wasn't helping." (*Id.* at 5.) The medical note indicates that Plaintiff "ambulated without complications" and that Plaintiff had a bone scan scheduled. (*Id.* at 19.) Another medical note dated April 14, but in different handwriting, indicates that Plaintiff was taking "3–4 motrin 600mg frequently," but it was "not effective," he was "using [a] cane to ambulate," and that he was "to see" another physician's assistant. (*Id.* at 20.) Plaintiff also went to sick call multiple times on April 15, 2014, once in a wheelchair, but does not allege who he saw on these

visits. (*Id.* at 5.) The medical notes from these visits are mostly illegible. However, they do indicate that Plaintiff complained of "terrible pain," that eventually the medications Plaintiff was taking "kick[ed] in," and that Plaintiff was later "return[ed] to [his] cell," where a corrections officer was to bring Plaintiff more "self[-]carry med[ication]s." (*Id.* at 20–21.)

"Gage requested to see [P]laintiff . . . the morning of [April 16, 2015] because of the many emergency sick all request[s]." (*Id.* at 5.) Gage evaluated Plaintiff. (*Id.*) Afterwards, "[P]laintiff was placed in the bullpen waiting to be sent back and . . . experienced extreme pain in his hip area." (*Id.*) Officer Sullivan notified Gage, "who looked at [P]laintiff and stated 'He was just examined[,] nothing is wrong with him.[']" (*Id.* at 5–6.)[3] "Gage then told [O]fficer Sullivan to write [P]laintiff a misbehavior report for faking." (*Id.*) Officer Sullivan said he would not do so, because "Gage isn't his boss and [P]laintiff does look in pain." (*Id.* at 6.) Yet, a misbehavior report was still filed, citing Plaintiff's "[r]efusal to obey a direct order," his "[f]ailure to follow staff directions," and his "[d]isturbing the order of the medical area." (*Id.* at 8; *see also* Defs.' Mem. Ex. C. at DEFT 37 ("Misbehavior Report").)[4] Officer Castle, an officer who had taken Plaintiff to medical call out, told Plaintiff that correction officers have "no authority over medical" because "they are their own agency." (FAC 6.) Plaintiff was then "carried to his cell in pain by two inmates helping him on each arm." (*Id.*)

On April 17, 2014, Plaintiff went back to emergency sick call at 9:45 am, and vomited upon entering the emergency room. (*Id.*; *see also id.* at 23.) Plaintiff alleges that Gage evaluated

[3] The medical notes dated April 16, 2014 are largely illegible, but do show that Plaintiff was seen twice and was "walk[ing] without difficulty," a misbehavior report was issued, and Plaintiff was kept in medical keeplock. (FAC 22–23.)

[4] Defendants claim that Plaintiff submitted a "poor copy" of this misbehavior report, and instead offers a "clearer copy." (Defs.' Mem. 11 (citing FAC 8; Defs.' Mem. Ex. C at DEFT 37.) The Court agrees, and therefore will cite to the version submitted by Defendants.

Plaintiff and said "I just s[aw] you yesterday" and had Plaintiff removed and sent back to his cell, also ordering the "officer to remove all medication from [P]laintiff." (*Id.* at 6.) The medical notes, taken by another provider, note that Gage did this because, "[u]pon questioning of symptoms [by Gage], [Plaintiff] became loud [and] argumentative." (*Id.* at 24; *see also id.* at 34 ("I again attempted to interview and examine this inmate but he would not stop talking.").) They also noted his "non-compliance" with his medicine plan. (*Id.* at 24.) Plaintiff was told to return later, but instead, Plaintiff ran to the visitor's room, "crying to his mother 'I want to go out to [the] hospital and not come back for re-evaluation.'" (*Id.* at 25; *see also id.* at 34 (same).)

Later, "[P]laintiff was called for a visit, when . . . Gage called [P]laintiff back down to see the 'Psychologist.'" (*Id.* at 6; *see also id.* at 34 ("[Plaintiff] was brought to medical, was seen by OMH and admitted to the infirmary.")) Plaintiff saw the psychologist for 5 minutes, "which was uncalled for since [P]laintiff doesn't have '[a] history of mental health problems.'" (*Id.* at 6.) "Plaintiff then proceeded to walk in pain to his visit." (*Id.*) Once at the visit, "[P]laintiff spoke with [Seargent] Johnson and ask[ed] him to help get him to the infirmary." (*Id.*)

Plaintiff was then moved to the infirmary. (*Id.* at 6, 34; *see also id.* at 26 ("Per Dr. Gage: [inmate] to be admitted to infirm[ary]. Strict Bedrest.").) He said to a Sing Sing employee, "I need to go out . . . what do I have to do[,] have chest pain?" (*Id.* at 25; *see also id.* at 34 (same).) Meanwhile, Plaintiff was sent out for the bone scan recommended by the orthopedist. (*Id.* at 34.) Plaintiff was "given two . . . misbehavior reports for no reason by . . . Gage." (*Id.* at 6.) At his hearing, Lieutenant Thayer found Plaintiff guilty. (*Id.*) However, Thayer "said to [P]laintiff 'I would find you not guilty but . . . Gage is some[one] important.'" (*Id.*)[5] Plaintiff was "isolated

---

[5] Defendants submit a purported transcript and hearing disposition report, but the Court will not consider these documents at the Motion to Dismiss stage. (*See* Defs.' Mem. 13 (citing these exhibits).)

in the infirmary without clothing and pain medication and cane or crutches or the essential necessities" from April 17 through 29, 2014. (*Id.*)

On May 2, 5, 6, 14, and 25 and June 16, 2014, Plaintiff "complained about the pain and the medication not helping, and ask[ed] Jane or John Doe for a cane or crutches." (*Id.* at 6–7.) However, an unidentified "[D]efendant refused to provide[] it." (*Id.* at 7.)[6] The medical notes from May 2 and 5 indicate that Plaintiff was still waiting for his bone scan results. (*Id.* at 26–27.) At some point on May 5, someone with an illegible signature noted in a medical note that "the bone scan reflects prosthetic loosening" and "[d]egenerative changes in [his] bilat[eral] knees," but "no evidence of osteomyelitis" and stated that an orthopedic consult request was submitted. (*Id.* at 27.)[7] On May 6, Plaintiff presented to the emergency room complaining of "severe pain;" a doctor was notified and ordered stronger medication and that Plaintiff see a provider in the morning. (*Id.*) The medical note from May 14 indicates that Plaintiff presented to the clinic for a follow-up and stated that his pain "went down to [a] 3 [out of] 10" after taking the medications and "denie[d] any complaints," but was still "awaiting [the] orthopedic surgeon." (*Id.* at 28.) The medical note from May 25 is illegible. (*Id.*)

"In total [P]laintiff went to the [Sing Sing] emergency sick-call approximately 33 times complaining of his hip pain." (*Id.* at 7; *see also id.* at 2 (same).) As a result of this alleged lack of treatment, Plaintiff was "in intense pain" for "an extreme length of time," including "chronic hip pain for months." (*Id.* at 3; *see also id.* at 7 (same).) "[P]laintiff's hip had shifted to the

---

[6] The Court notes the inconsistency between Plaintiff's allegations that he was without medications and his allegation that he complained the medications he had were not working.

[7] Osteomyelitis "is an infection of the bone." *Wright v. United States*, No. 13-CV-1379, 2017 WL 3142041, at *11 (E.D.N.Y. July 24, 2017); *see also* WebMD, *Osteomyelitis,* https://www.webmd.com/diabetes/osteomyeltis-treatment-diagnosis-symptoms#1 (last visited May 30, 2018) (same).

point that he had to receive another hip replacement surgery on [October 7, 2014]." (*Id.* at 7.)

"[P]laintiff had continuously told [D]efendants that his hip felt like it had shifted, because he was unable to walk on it and was requesting a cane or crutches to no avail." (*Id.*; *see also id.* at 3 (alleging that staff were "aware of [his] situation" because they witnessed the "complete disregard" of it "on many occas[]ions"); Pl.'s Mem. 1, 4 (alleging that Defendants were aware that Dr. Holder had diagnosed Plaintiff with loosening of prosthetics in his hip).) Plaintiff requests $1,000,000 in punitive damages and $1,000,00 in compensatory damages. (FAC 11.)[8]

    B. Procedural Background

    Plaintiff filed an initial Complaint against Furco, Gage, and Abe Kanari on January 6, 2015. (Compl. (Dkt. No. 2).) He was granted in forma pauperis status on January 22, 2015. (Dkt. No. 4.) On January 29, 2015, the Court issued an Order directing service on those Defendants. (Order of Service (Dkt. No. 6).) Furco and Gage were properly served, (Dkt. Nos. 13, 14), but service on Abe Kanari was unsuccessful, (Dkt. No. 15.) Plaintiff therefore requested that the Court issue an order pursuant to *Valentin v. Dinkins*, 121 F.3d 72 (2d Cir. 1997), to determine the correct name of the nurse he had called "Abe Kanan" or "Abacondi," (Letter from Plaintiff to Court (May 6, 2015) (Dkt. No. 16)), which the Court did, (Order (Dkt. No. 17)). In response, on June 10, 2015, Defendants filed a letter identifying Albert Adeknami and providing his service address. (Letter from Jason M. Clark, Esq. to Court (June 10, 2015) (Dkt. No. 28).)

---

[8] Plaintiff also requested an injunction "to receive proper medical care[] that [he] fully require[s]." (FAC 11.) However, Defendants argued in the instant Motion that because Plaintiff already received the necessary hip replacement surgery, his request for injunctive relief is moot. (Defs.' Mem. 15.) Plaintiff declined to respond to this point in his opposition "because it is moot." (Pl.'s Mem. 3 n.1.) The Court construes this statement as a concession that his request for injunctive relief is moot, but Plaintiff may allege otherwise in an amended complaint.

Additionally, on June 2, 2015, Defendants filed a pre-motion letter indicating the grounds on which they would move to dismiss the Complaint. (Letter from Jason M. Clark, Esq. to Court (June 2, 2015) (Dkt. No. 27).) The Court held a pre-motion conference at which it granted Plaintiff leave to file an amended complaint by November 13, 2015, (*see* Dkt. (entry for Sept. 24, 2015)), which Plaintiff did, this time also naming Albert Adeknami, Bigaud, and Thayer as Defendants, (FAC).[9] These Defendants were served. (*See* Dkt. Nos. 44–46.)

On January 27, 2016, Defendants filed an Answer. (Dkt. No. 49.) On August 25, 2017, Defendants filed a pre-motion letter indicating the grounds on which they would move to dismiss the Amended Complaint. (Letter from Janice Powers, Esq. to Court (Aug. 25, 2017) (Dkt. No. 58).) Pursuant to a briefing schedule set by the Court, (Dkt. Nos. 59, 61), Defendants filed their Motion To Dismiss on October 13, 2017, (Notice of Mot.). The Court permitted Defendants to provide the Court with the unredacted accompanying papers without uploading them on ECF, because they contained Plaintiff's confidential medical records. (Dkt. No. 65.) However, the Court later permitted Defendants to file the unredacted Motion under seal and ordered them to file redacted copies on ECF. (*See* Dkt. Nos. 78–81.) Plaintiff filed an opposition on February 20, 2018. (Pl.'s Mem; *see also* Dkt. Nos. 67, 68 (extensions).) The same day, Plaintiff filed a motion for leave to amend, (Mot. for Leave to Amend (Dkt. No. 70)), which the Court denied because "[n]o reasons for the amendment of this three-year-old case [we]re provided and there is

---

[9] Plaintiff also filed an application for the appointment of counsel, (Dkt. No. 37), which the Court denied without prejudice on March 31, 2016, (Dkt. No. 50). On April 18, 2016, Plaintiff filed a motion pursuant to Federal Rule of Civil Procedure 15 for "permission to file a second amended petition." (Notice of Mot. (Dkt. No. 51).) The Court denied the motion, explaining that it construed it as either a motion for reconsideration of the denial of Plaintiff's request for appointment of counsel or a second motion for appointment of counsel, and either way Plaintiff had provided no new facts suggesting changed circumstances. (Dkt. No. 52.)

a pending motion to dismiss," (Dkt. No. 71).  Defendants filed a reply on April 13, 2018.  (Defs.'

Reply Mem. of Law in Supp. of Mot. to Dismiss ("Defs.' Reply") (Dkt. No. 74).)

## II.  Discussion

### A.  Standard of Review

Defendants move to dismiss under Federal Rule of Civil Procedure 12(c).  (Not. of Mot.)

"In deciding a Rule 12(c) motion, [the Court] employ[s] the same standard applicable to

dismissals pursuant to Rule 12(b)(6)."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429

(2d Cir. 2011) (alterations and internal quotation marks omitted).  The Supreme Court has held

that although a complaint "does not need detailed factual allegations" to survive a motion to

dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more

than labels and conclusions, and a formulaic recitation of the elements of a cause of action will

not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and internal quotation

marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an

unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009) (internal quotation marks omitted).  "Nor does a complaint suffice if it tenders naked

assertions devoid of further factual enhancement."  *Id.*  (alteration and internal quotation marks

omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief

above the speculative level."  *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated

adequately, it may be supported by showing any set of facts consistent with the allegations in the

complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that

is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the

line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556

U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a

context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering Defendants' Motion To Dismiss, the Court is required to "accept as true all of the factual allegations contained in the [C]omplaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). And, the Court must "draw[] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Where, as here, a plaintiff proceeds pro se, the Court must "construe[] [his complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (internal quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedure and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (internal quotation marks omitted).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted). However, when the complaint is drafted by a pro se plaintiff, the

Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (internal quotation marks omitted), including "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted).

### B. Analysis

#### 1. Personal Involvement

Defendant Adeknami argues that the Amended Complaint should be dismissed against him because he was not personally involved in the alleged constitutional violations. (Defs.' Mem. 16–17.) "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (alterations, italics, and internal quotation marks omitted). In other words, "because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Therefore, Plaintiff must plausibly allege that Bentivegna's actions fall into one of the five categories identified above. *See Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *4 (S.D.N.Y. Jan. 24, 2017) (holding that the

five categories "still control[] with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal*).

Adeknami is not mentioned in the Amended Complaint.  (*See* FAC.)  However, Plaintiff now argues that "Adeknami is listed as 'John Doe' in [the] [A]mended [C]omplaint."  (Pl.'s Mem. 3.)  Specifically, he alleges that he "was seen by . . . Adeknami on March 21 and 26, 2015, at emergency sick-call in extreme pain and . . . was given medication that did not work."  (*Id.*)  Plaintiff also alleges that he "was seen by . . . Adeknami on April 4, 13, 14 and 15[,] 2014, [and] May 2, 5, and 6, 2014," and Adeknami "stated that nothing was wrong with [P]laintiff and sent him back to his cell in pain."  (*Id.*)  Although the Court may consider factual allegations raised for the first time in a pro se plaintiff's opposition papers, it will only do so if they are plausible and consistent with the allegations in the complaint.  *See Vlad-Berindan v. MTA New York City Transit*, No. 14-CV-675, 2014 WL 6982929, at *6 (S.D.N.Y. Dec. 10, 2014) (collecting cases); *see also Carson Optical Inc. v. eBay Inc.*, 202 F. Supp. 3d 247, 255 (E.D.N.Y. 2016) ("[W]here [the] plaintiff's own pleadings are internally inconsistent, a court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true in deciding a motion to dismiss." (internal quotation marks omitted)).

Plaintiff's new allegation that Adeknami is "John Doe" does not satisfy these criteria.  As an initial matter, Adeknami has been a named Defendant in this Action since Plaintiff filed the initial Complaint on January 6, 2015, (*see* Compl. (naming Abe Kanari as a Defendant)), and Plaintiff was informed of Adeknami's correct name on June 10, 2015, (*see* Dkt. No. 28), but has *never* named Adeknami in the body of any complaint or made any specific factual allegations against him.  It is therefore not plausible that an always-named Defendant is now an unnamed John Doe.  Moreover, on May 6, 2015, Plaintiff described Adeknami as a 6"-6-1", bald, dark-

skinned male nurse with glasses.  (Letter from Plaintiff to Court (May 6, 2015) (Dkt. No. 16).)

However, the allegations in the Amended Complaint that Plaintiff now claims are actually about

Adeknami reference a "Defendant Jane *or* John Doe," (FAC 4, 5, 7 (emphasis added)), and at

least as to the April 4, 2014 incident, involved *only* a "Jane Doe," (*id.* at 5).  It is thus neither

plausible nor consistent with the allegations in the Amended Complaint to infer that Plaintiff,

who has always known Adeknami was male, would have referred to him as a Jane Doe.  Finally,

Plaintiff alleges that, in addition to other listed dates, Adeknami "stated that nothing was wrong

with [P]laintiff and sent him back to his cell in pain" on April 14 and 15 and May 2, 5, and 6,

2014, (Pl.'s Mem. 3), but these allegations are different from the allegations for those dates in the

Amended Complaint, (*see* FAC 5 (alleging that on April 14, "Plaintiff asked Defendant Jane or

John Doe for better medication because what he was getting wasn't helping"); *id.* ("It is worthy

to note that [P]laintiff went to emergency sick call three (3) times on 4/15/14. . . ."); *id.* at 6–7

(alleging that on May 2, 5, and 6, "[P]laintiff complained about the pain and the mediation not

helping and ask[ed] Jane or John Doe for a cane or crutches, but [D]efendant refused to provide[]

it"); *cf.* FAC 5 ("On 4/13/14 . . . Defendant Jane or John Doe stated that nothing I was saying

matter[ed] and that [P]laintiff is going back to his cell.")).

In light of the implausibility of Plaintiff's new allegations regarding Adeknami's personal

involvement and the inconsistencies they create with the allegations in the Amended Complaint,

the Court grants Adeknami's Motion To Dismiss the claims against him for lack of personal

involvement.[10]  If Plaintiff wishes to pursue these claims, he must allege specifically what

---

[10] Although not necessary to its decision, the Court also notes that at least some of the allegations against Adeknami, even assuming he is "John Doe," fail to state an Eighth Amendment violation.  *See Wandell v. Koenigsmann*, No. 99-CV-8652, 2000 WL 1036030, at *4 (S.D.N.Y. July 27, 2000) (collecting cases holding that "[w]hether an injured prisoner should be provided crutches is a medical judgment as to the appropriate course of treatment, and

actions Adeknami took, and on which dates, in the body of an amended complaint.

## 2. Eighth Amendment Claim

Plaintiff alleges that Defendants Furco, Gage, and Bigaud were deliberately indifferent to his medical needs by unreasonably delaying the treatment of, and necessary replacement surgery for, his hip. (*See* FAC; Pl.'s Mem. 3–5.) Defendants argue that Plaintiff fails to plausibly allege an Eighth Amendment violation. (Defs.' Mem. 17–22.)[11]

### a. Standard of Review

"The Eighth Amendment forbids 'deliberate indifference to serious medical needs of prisoners.'" *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To state a deliberate indifference claim, Plaintiff must plausibly allege (1) "that he suffered a sufficiently serious constitutional deprivation," and (2) that Defendants "acted with deliberate indifference." *Feliciano v. Anderson*, No. 15-CV-4106, 2017 WL 1189747, at *8 (S.D.N.Y. Mar. 30, 2017).

"The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." *Spavone*, 719 F.3d at 138 (internal quotation marks omitted). In other words, "the inmate must show that the conditions, either alone or in combination, pose an

---

disagreement with that decision is not actionable under the Eighth Amendment"); *Veloz v. New York*, 35 F. Supp. 2d 305, 307, 312 (S.D.N.Y. 1999) (dismissing allegations that a doctor did not prescribe the plaintiff a wheelchair, crutches, or a cane after a foot operation as insufficiently serious); *Johnson v. Dep't of Corr.*, No. 93-CV-8365, 1994 WL 665934, at *4 (S.D.N.Y. Nov. 28, 1994) (dismissing Eighth Amendment claim that the pain medicine the plaintiff received "was insufficient and ineffective" because the plaintiff "had no right to his preferred treatment"); *see also Bryant v. Wright*, 451 F. App'x 12, 14 (2d Cir. 2011) ("It is a common exercise of judgment to place prisoners on generic medications, and this act, without more, does not suggest the recklessness necessary for a constitutional claim of deliberate indifference.").

[11] As a convicted prisoner, Plaintiff's deliberate indifference claim is analyzed under the Eighth Amendment, because it is an allegation that his "conditions of confinement were a form of punishment." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017).

unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013). Analyzing this objective requirement involves two inquiries: "whether the prisoner was actually deprived of adequate medical care," *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006), and "whether the inadequacy in medical care is sufficiently serious," which in turn "requires the [C]ourt to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner," *id.* at 280. "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). Nevertheless, the Second Circuit has suggested the following non-exhaustive list of factors to consider when evaluating an inmate's medical condition: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'" *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). "When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious, to support an Eighth Amendment claim." *Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003) (internal quotation marks omitted).

"The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care." *Spavone*, 719 F.3d at 138. This means that the defendant must "appreciate the risk to which a prisoner was subjected," and have a "subjective awareness of the harmfulness associated with those conditions." *Darnell*, 849 F.3d at 35; *see also Nielsen v.*

*Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) ("Deliberate indifference is a mental state equivalent to subjective recklessness," and it "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." (internal quotation marks omitted)). In other words, "[i]n medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Id.* (internal quotation marks omitted). However, "mere negligence" is insufficient to state a claim for deliberate indifference. *Walker*, 717 F.3d at 125 (internal quotation marks omitted). Neither does "mere disagreement over the proper treatment . . . create a constitutional claim," and accordingly, "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703.

Defendants argue that Plaintiff fails to satisfy the objective and subjective prongs. (Defs.' Mem. 17–22.) The Court will address each prong separately.

### b. Objective Prong

Defendants briefly argue, without citing any caselaw, that Plaintiff does not satisfy the objective prong, because "[a] mild loosening" of prosthesis—here, pins—in Plaintiff's hip is not an objectively serious medical condition. (Defs.' Mem. 21–22.) The Court disagrees. Plaintiff alleged that, over the course of approximately six months, he suffered severe and chronic hip pain that at times prevented him from standing or walking and that prompted him to visit the medical facility at Sing Sing at least 33 times. (*E.g.*, FAC 3, 7; Pl.'s Mem. 4.) He also alleges that this was caused by a loosening of the pins in his hip, made worse by the delay in his treatment and confirmed by his bone scan results received on May 5, 2014, but he did not receive

hip replacement surgery until October 6, 2014.  (*E.g.* FAC 27; Pl.'s Mem. 1, 4.)  At this stage, these allegations plausibly state an objectively serious medical condition.  *See Hathaway v. Coughlin*, 37 F.3d 63, 67 (2d Cir. 1994) (finding objective prong satisfied where the plaintiff's "degenerative hip condition required corrective surgery prior to his incarceration" and "[a]fter the initial surgery, [the plaintiff] continued to experience great pain over an extended period of time and had difficulty walking," registering almost 70 "complaints of hip pain" prior to his second surgery); *Villafane v. Sposato*, No. 16-CV-3674, 2017 WL 4179855, at *20–21 (E.D.N.Y. Aug. 22, 2017) (denying summary judgment on objective prong of claim that medical professionals directed that the plaintiff "be immediately produced for surgery to repair his broken left forearm," but the "[d]efendants were delayed in getting [the] [p]laintiff the requisite medical care," and as a result "doctors were forced to rebreak [the] [p]laintiff's arm and install metal plates and screws"), *adopted by* 2017 WL 4157220 (E.D.N.Y. Sept. 15, 2017); *Kucharczyk v. Westchester Cty.*, 95 F. Supp. 3d 529, 541–42 (S.D.N.Y. 2015) (denying motion to dismiss on objective prong where the plaintiff alleged prolonged "severe" pain and a delay of "many months" in receiving surgery); *see also Smith*, 316 F.3d at 185–86 (focusing on the delay in treatment "rather than the prisoner's underlying medical condition alone" (emphasis omitted)).

### c.  Subjective Prong

Defendants also argue that Plaintiff fails to plausibly allege they were deliberately indifferent—that is, subjectively reckless—in their denial of medical care.  (Defs.' Mem. 17–22.) Construing Plaintiff's submissions liberally, he raises two deliberate indifference claims—one relating to the delay in receiving hip replacement surgery, and one relating to the ongoing treatment he received for his hip pain.  The Court will address each claim separately.

## i. Delayed Surgery

Plaintiff's first claim is that Defendants were aware that Dr. Holder had diagnosed Plaintiff with a loosening of the prosthetic in his hip, but failed to arrange hip replacement surgery for him for six months. (Pl.'s Mem. 4; *see also* FAC 3, 7.) Specifically, Plaintiff alleges that he "continuously told [D]efendants that his hip felt like it had shifted, because he was unable to walk on it and was requesting a cane or crutches to no avail," (FAC 7), and that Defendants were "aware of [his] situation" because they witnessed the "complete disregard" of it "on many occas[]ions," (*id.* at 3). However, Plaintiff provides no details regarding which Defendants he told this to, or when. The fact that he alleged hip pain, without more, does not show that Plaintiff specifically informed Defendants that he felt his hip pins had loosened or that they knew failure to immediately perform surgery would exacerbate his hip pain.

Plaintiff alleges in his opposition that Defendants "were all made aware" of Dr. Holder's diagnosis "[a]s of April 4, 2014," but this allegation is not plausible in light of the other allegations in the Amended Complaint and the attached medical records. (Pl.'s Mem. 4.) For example, the medical note for April 4, 2014 indicates only that Dr. Holder recommended a bone scan "for evaluation of loosening of prosthesis," not that he had diagnosed Plaintiff already or that Defendants were aware of Dr. Holden's recommendation. (Pl.'s Mem. Ex. B. at 3.) Although the medical notes indicate that Bigaud saw Plaintiff at some point on April 4 as well, they do not indicate what time he saw Plaintiff, whether Bigaud was informed of Dr. Holder's recommendation, or whether Bigaud discussed it with Plaintiff. (FAC 17–18.) *See, e.g.*, *Veloz v. New York*, 339 F. Supp. 2d 505, 525–26 (S.D.N.Y. 2004) (finding no deliberate indifference where the plaintiff "received treatment for his spinal condition" and "none of the specialists reviewing [the] plaintiff's [test results] ever indicated that [the] plaintiff needed surgery," or that

his "chronic condition . . . was . . . a condition of urgency" (internal quotation marks omitted)),

*aff'd*, 178 F. App'x 39 (2d Cir. 2006); *cf. Benjamin v. Schwartz*, 299 F. Supp. 2d 196, 200

(S.D.N.Y. 2004) (finding that the plaintiff plausibly alleged deliberate indifference where "an

orthopedic surgeon diagnosed the problem definitively and stated that surgery was needed . . .

but the surgery was not performed until . . . a year and more after that"), *aff'd*, 204 F. App'x 979

(2d Cir. 2006). Indeed, even if the Court were to assume that the person who wrote the April 4,

2014 medical note was Bigaud, it is signed by only one person, with an illegible signature, and in

no way suggests that the other Defendants were present or also had this knowledge. (Pl.'s Mem.

Ex. B at 3.) Further, the medical note indicates that the evaluator, even assuming it was Bigaud,

ordered the labs and provided the cane recommended by Dr. Holder, (*id.*), and the medical note

from April 14 indicates that the bone scan was scheduled, although it does not state when, (FAC

19). According to other medical notes, Plaintiff did not receive his bone scan results until May

5, 2014. (*Id.* at 27.) The "bone scan reflect[ed] prosthetic loosening" and "[d]egenerative

changes in [his] bilat[eral] knees," but "no evidence of osteomyelitis." (*Id.*) Plaintiff does not

allege that any of Defendants wrote this medical note, read the results of the bone scan, or were

otherwise informed of them, and the signature on the medical note is illegible. Indeed,

Plaintiff's allegations and the submitted exhibits do not clearly mention any of the named

Defendants in the events described following May 5, 2014. (*See* FAC 6–7 (factual allegations),

27–29 (medical notes); *but see id.* at 30 (note from June 25, 2014 signed by Bigaud indicating

that Plaintiff had labs, a chest x-ray, and an "H&P" completed, was awaiting an EKG ordered on

June 17, and had a surgery "RBD" scheduled for July 6).)[12] Thus, Plaintiff's conclusory

---

[12] The Court therefore concludes that, even if Plaintiff had plausibly alleged deliberate indifference claim relating to the delay in receiving hip replacement surgery, Defendants were not personally involved in this constitutional violation. *See Grullon*, 720 F.3d at 138–39

allegations that Defendants were aware of his condition, and the corresponding need for hip replacement surgery, are insufficient to plausibly allege deliberate indifference. *See Darnell*, 849 F.3d at 35 (requiring a defendant to "appreciate the risk to which a prisoner was subjected" and have a "subjective awareness of the harmfulness associated with those conditions"); *Stewart v. City of New York*, No. 15-CV-4335, 2018 WL 1633819, at *8 (S.D.N.Y. Mar. 31, 2018) ("To survive a motion to dismiss on this theory [of deliberate indifference to medical needs], [the plaintiff] must still plausibly allege that [the] [i]ndividual [d]efendants intentionally or recklessly delayed his access to care when they knew or should have known that the delay posed an excessive risk to his health or safety."); *Ward v. Capra*, No. 16-CV-6533, 2018 WL 1578398, at *6 (S.D.N.Y. Mar. 29, 2018) (dismissing claim on subjective prong because the plaintiff "offer[ed] only conclusory allegations that [the defendant] was . . . 'fully aware' of [the] [p]laintiff's condition").

Moreover, even assuming one of the Defendants wrote the note describing the bone scan results or that the others were aware of it, this alone would be insufficient to demonstrate deliberate indifference. The same day Plaintiff learned of his bone scan results, a request for an orthopedic consult was submitted, and the next day, a doctor was notified about Plaintiff's pain, resulting in further prescriptions for drugs. (FAC 27.) As of May 14, 2014 Plaintiff was still "awaiting [an] orthopedic surgeon." (*Id.* at 28; *see also id.* at 30 (medical note from June 25, 2014 signed by Bigaud mentioning "surgery RBD 7/6").) Plaintiff ultimately received hip replacement surgery at an outside hospital on October 6 or 7, 2014—approximately 5 months

---

(describing personal involvement requirement); *see also Hernandez v. Keane*, 341 F.3d 137, 149 (2d Cir. 2003) (noting that even if the evidence "support[ed] findings that someone involved in [the plaintiff's] care (other than the defendants at issue) . . . was deliberately indifferent," such evidence is not "relevant to this [case] or to the resolution of any lawsuit brought under 42 U.S.C. § 1983 against these defendants").

later.  (Pl.'s Mem. 1, 4; FAC 7.)  Therefore, this is not a case in which Defendants—even assuming they had knowledge of the broken pins in Plaintiff's hip—failed to acknowledge the need for or schedule a surgery, even in the face of Plaintiff's complaints.  *Cf. Hathaway*, 37 F.3d at 67 (finding inference of deliberate indifference where the defendant discovered that the plaintiff "had two broken pins in his hip" but "never shared this information with [the plaintiff] or raised the possibility of surgery with him following the discovery of the broken pins"); *see also Hernandez v. Keane*, 341 F.3d 137, 146 (2d Cir. 2003) (distinguishing *Hathaway* because "[i]n that case . . . the inmate was kept waiting two years before being evaluated for surgery to abate chronic pain in his hips; and during that time his doctors withheld relevant information regarding the cause of the pain: broken pins from an earlier hip surgery," whereas "[h]ere, it was clear to everyone what was causing [the] plaintiff's pain, but unclear for long periods what to do about it," and  "the delays were much shorter than in *Hathaway*").[13]

Nor does Plaintiff plausibly allege that Defendants "knew the extent of [his] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [his] situation."  *Hathaway*, 37 F.3d at 68.  Rather, Plaintiff was continuously treated for months following his bone scan results—and indeed received several other medical tests and treatments including stronger medications recommended by doctors, some of which were successful in decreasing Plaintiff's pain and permitting him to ambulate—and received the necessary surgery within 5 months.  (*E.g.*, FAC 27–30.)  *See Hernandez*, 341 F.3d at 146 (finding no deliberate indifference where "most of th[e] delay [in receiving surgery] was caused by factors outside [the] defendants' control," and that "[t]he intervals attributable to [the]

_____

[13] Plaintiff attempts to distinguish *Hernandez*, but his argument is incomplete.  (Pl.'s Mem. 5 ("This reasoning must fail because the circumstances in Hernandez delay and . . .").)

defendants are . . . reduced to a matter of months, during which [the] plaintiff was either under evaluation for surgery or under treatment for other medical conditions"); *Waller v. DuBois*, No. 16-CV-6697, 2018 WL 1605079, at *7 (S.D.N.Y. Mar. 29, 2018) (dismissing deliberate indifference claim because "the alleged delay in scheduling surgery was minimal," and "[d]uring this time, [the] [p]laintiff's doctors were exploring other medical treatments, prescribing him medication, and allowing for [the] [p]laintiff to have access to medical care, as he claims to have been in medical . . . every other day"); *Benjamin v. Galeno*, 415 F. Supp. 2d 254, 259 (S.D.N.Y. 2005) (finding no deliberate indifference because the "[p]laintiff's voluminous medical records make clear that [he] was well attended to for his multiple medical conditions," and the plaintiff "provide[d] no evidence that [the defendants] knew that the course of treatment prescribed . . . would be ineffective or would cause harmful effects"), *aff'd*, 204 F. App'x 979 (2d Cir. 2006); *id.* at 259–60 (noting that the plaintiff's complaint against one defendant was "that he failed to recommend him for surgery after reviewing the MRI of [the] plaintiff's right shoulder," but "[t]he record . . . [wa]s clear that [the defendant] showed concern for [the] plaintiff's well being—including a concern for the treatment of [his] injured shoulder"); *Pabon v. Goord*, No. 99-CV-5869, 2003 WL 1787268, at *11 (S.D.N.Y. Mar. 28, 2003) ("While Plaintiff was awaiting a consult with a neurosurgeon, his pain was not ignored. He was seen repeatedly by an orthopedist, a neurologist, a physiatrist, and his primary care physicians. During this period, consistent with the neurologist's recommendations, Plaintiff was receiving medication for his pain. . . ."). Absent allegations that Defendants "intentionally or recklessly delayed his access to care when they knew or should have known that the delay posed an excessive risk to his health or safety"—such as necessitating a more severe surgery or creating permanent, life-altering damage to his hip—Plaintiff has not alleged a deliberate indifference claim. *Stewart*, 2018 WL

1633819, at *8; *see also Pabon v. Wright*, No. 99-CV-2196, 2004 WL 628784, at *8 (S.D.N.Y. Mar. 29, 2004) ("The Second Circuit has reserved [a deliberate indifference] classification for cases in which, for example, officials deliberately delayed medical care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years." (internal quotation marks omitted)), *aff'd*, 459 F.3d 241 (2d Cir. 2006). At best, Plaintiff has alleged either negligence, *see Walker*, 717 F.3d at 125, or his preference for a different treatment, *see Chance*, 143 F.3d at 703, neither of which implicates the Eighth Amendment.

### ii. Failure to Treat Hip Pain

Construing the Amended Complaint liberally, Plaintiff also alleges deliberate indifference to his hip pain prior to the recognized need for replacement surgery. In most—but not all—instances, these claims also fail, because Plaintiff does not allege that on specific occasions, Defendants were aware of the risks of not treating his injury but recklessly mistreated it or chose not to treat it. *See Nielsen*, 746 F.3d at 63 (describing deliberate indifference standard). The Court will address the allegations against each Defendant separately.

### (1) Furco

First, as to Furco, Plaintiff alleges that on several occasions, he went to sick call and told Furco he was in pain and requested medication, a cane, or crutches, but Furco denied him this treatment. (FAC 4 (listing an incident on an unspecified day in February and on March 8, 9, 30, and 31, 2014).) As explained earlier, denials of a cane, crutches, or the medication of Plaintiff's choice, at least in the absence of allegations that a doctor had already prescribed Plaintiff these items, do not violate the Eighth Amendment. *See Curtis v. Williams*, No. 11-CV-1186, 2014 WL 2619805, at *5 (S.D.N.Y. June 12, 2014) (dismissing claims against Furco that

she did not provide Plaintiff with a cane); *Wandell*, 2000 WL 1036030, at *4 (holding that

denials of crutches do not violate the Eighth Amendment); *Johnson*, 1994 WL 665934, at *4

(dismissing Eighth Amendment claim that the pain medicine the plaintiff received "was

insufficient and ineffective").  Again, "mere disagreement over the proper treatment does not

create a constitutional claim."  *Chance*, 143 F.3d at 703.

However, construing the Amended Complaint liberally, Plaintiff alleges that Furco

intentionally denied him *all* treatment, despite knowing Plaintiff was in pain, on five occasions.

(FAC 4.)  For such conduct to constitute deliberate indifference, Furco must have denied

Plaintiff treatment "not because he [did not] need it," but "only because" of some other

inappropriate consideration.  *Harrison v. Barkley*, 219 F.3d 132, 134 (2d Cir. 2000).  Only one

of the alleged interactions with Furco satisfies this standard.  Plaintiff alleges that on his first

emergency sick call, on an unspecified date sometime before March 8, 2014, Furco evaluated

him, found "nothing wrong," and sent him "back to his cell without any medication or medical

attention," stating that Plaintiff "just want[s] to sue."  (FAC 4.)  The fact that Furco evaluated

Plaintiff and concluded that he did not need medical care alone does not show deliberate

indifference, as it is a medical judgment.  *See Hernandez*, 341 F.3d at 147 ("This is precisely the

sort of issue that cannot form the basis of a deliberate indifference claim.").  However, drawing

all reasonable inferences in favor of Plaintiff, Furco's comment that Plaintiff "just want[s] to

sue" evinces an ulterior motive to not treat Plaintiff, despite knowing he is in pain—perhaps

retribution for past litigiousness or preempting a future lawsuit over the care received.  (FAC 4.)

At this stage, this is sufficient to plausibly allege deliberate indifference.  *See Chance*, 143 F.3d

at 704 ("This allegation of ulterior motives, if proven true, would show that the defendants had a

culpable state of mind and that their choice of treatment was intentionally wrong and did not

derive from sound medical judgment."); *Harrington v. Mid-State Corr. Facility*, No. 09-CV-85, 2010 WL 3522520, at *14 (N.D.N.Y. May 21, 2010) (explaining that the defendant's statement of "his intention not to treat [the plaintiff] at all because of his propensity to constantly file complaints" evinced another motivation aside from "medical judgment" for "failing to provide [the plaintiff] with any care at all"), *adopted by* 2010 WL 3522516 (N.D.N.Y. Sept. 2, 2010). Therefore, the Court declines to dismiss this claim against Furco.

However, it is significant that Plaintiff did not submit a medical note (or provide a date) for this incident with Furco. The exhibits Plaintiff *did* submit render all of his other allegations against Furco implausible. After Plaintiff began experiencing hip pain in February 2014, *Bigaud*, not Furco, examined him and an x-ray was taken which "showed no disruption of his hip prosthesis," although an orthopedic evaluation was still requested and scheduled for March 6. (FAC 14, 33.) Plaintiff's first normal "sick call" was on March 3, 2014, and, even assuming this was with Furco, the note indicates that Plaintiff requested "to see a specialist [and] a cat scan," and was observed walking and moving quickly "[without] pain." (*Id.* at 14.)[14] Plaintiff then went to an emergency sick call on March 8, and Furco documented that Plaintiff laughed about the fact that he had skipped his scheduled orthopedic consultation. (*Id.* at 14, 33.) On that visit, Furco also noted that Plaintiff was "able to sit/stand" and that he was scheduled to see Bigaud on March 10. (*Id.* at 14.) Thus, Plaintiff's allegations that Furco again denied him medication, a cane, or crutches, without more, do not plausibly allege deliberate indifference. (*See id.* at 4.)

The next day, Plaintiff returned to emergency sick call and asked Furco to send him to an outside hospital, but Furco allegedly "stated that there wasn't anything wrong with him and told

---

[14] Because Plaintiff alleges that he saw Furco on March 8 and because the signature on the medical note for March 8 looks identical to the signature on the note for March 3, the Court will assume that Furco handled both of these sick calls. (*See* FAC 4, 14.)

the officer to remove [P]laintiff." (*Id.*)  However, the exhibits indicate that Plaintiff was removed because he was yelling and threatening to write Furco up, because Furco deemed his condition to be a "non-medical emergency," and because Plaintiff was able to ambulate full weight bearing. (*Id.* at 15; *see also id.* at 33.)  Plaintiff does not allege that he saw Furco again until "March 30 and 31," when "Furco refused to provide him with a cane or crutches," stating his "complaints w[ere] a non[-]emergency." (*Id.* at 4.)  Again, even assuming the unwarranted denial of these items could violate the Eighth Amendment, the medical records contradict Plaintiff's allegations.  On March 30, Furco determined that a "cane [was] not medically indicated at this time," and noted that Plaintiff had appointments to see Bigaud on March 31, was on naproxen and under other medical restrictions, and should return to emergency sick call if his situation worsened. (*Id.* at 17.)  The March 31 note indicates that Plaintiff came to his visit "on crutches" and was ambulatory when he chooses to be, belying his claim that he was denied any crutches. (*Id.*)  Meanwhile, between March 8 and 30, Plaintiff received additional treatment from other staff members, including pain medications and evaluations by Bigaud. (*Id.* at 4, 15–16.)  At best, Plaintiff's allegations against Furco on these dates are disagreements with the treatment he received, rather than allegations that he received no necessary medical care at all, and thus do not plausibly allege deliberate indifference. *See Chance*, 143 F.3d at 703.

### (2)  Bigaud

Plaintiff fails to allege any deliberate indifference by Bigaud.  Throughout the Amended Complaint and the attached exhibits, Bigaud is mentioned only a handful of times.  First, according to a medical record, Bigaud evaluated Plaintiff on February 3, 2014, and the "exam was unremarkable." (FAC 33.)  On March 10, 21, 25, and 26, 2014, Plaintiff alleges that he was "seen by . . . Bigaud, who provide[d] Plaintiff with pain medication which did not help." (*Id.* at

4.)  As explained above, this did not violate the Eighth Amendment.  *See Johnson*, 1994 WL

665934, at *4 (dismissing Eighth Amendment claim that the pain medicine the plaintiff received

"was insufficient and ineffective").  Indeed, on March 25, Plaintiff saw Bigaud "for

hypertension," and Bigaud evaluated him and completed a "cane form."  (FAC 16.)  The March

30 medical note indicates that Plaintiff complained to Furco that he had seen Bigaud and "he is

not doing anything for me, I want a[n] MRI" and "a cane."  (*Id.* at 17.)  Again, that Plaintiff

wanted "a different treatment does not give rise to an Eighth Amendment violation."  *Chance*,

143 F.3d at 703; *see also Joyner v. Greiner*, 195 F. Supp. 2d 500, 504 (S.D.N.Y. 2002) ("The

fact that [the] plaintiff wanted an MRI done does not mean that the doctor who refused to order

one was deliberately indifferent to his medical needs.").  At that time, Plaintiff was being

evaluated constantly, had a prescription for naproxen, was placed on other medical restrictions,

and, at least as of March 31, when Plaintiff was scheduled to see Bigaud again, had crutches and

was "ambulatory ad lib."  (FAC 17.)  Bigaud is also mentioned in two medical notes, which state

that Plaintiff was seen by Bigaud on April 4, 2014.  (*Id.* at 17, 18.)  However, Plaintiff does not

allege any facts about what happened at that visit, and the medical note indicates that whoever

did see Plaintiff on April 4 recommended labs and a bone scan and provided Plaintiff with a

cane, all as recommended by Dr. Holder.  (Pl.'s Mem. Ex. B at 3.)  Bigaud is not mentioned

again.

<center>(3)  Gage</center>

Plaintiff also fails to plausibly allege that Gage was deliberately indifferent to his hip

pain.  Plaintiff alleges that, on April 16, 2015, Gage requested to see Plaintiff "because of the

many emergency sick call request[s]" and evaluated him.  (FAC 5.)  The submitted exhibits

indicate that Plaintiff "was without pain or complaint" during the examination and was able to

<center>30</center>

"walk and maneuver without difficulty." (FAC 34; *see also id.* at 22; Misbehavior Report.)

However, Plaintiff next alleges that he was in "extreme pain in his hip area" while in the bullpen

waiting to be sent back to his cell, and that when Gage was notified, she "looked at [P]laintiff

and stated 'He was just examined[,] nothing is wrong with him,'" and "told [O]fficer Sullivan to

write [P]laintiff a misbehavior report for faking," even though Officer Sullivan thought Plaintiff

did "look in pain." (FAC 5–6.) According to the submitted exhibits, though, Plaintiff was

ordered to stop his writhing around in the bullpen, but refused; he was therefore removed back to

medical keeplock and issued a misbehavior report. (*Id.* at 23, 34; Misbehavior Report.) These

facts do not plausibly demonstrate Gage was deliberately indifferent. Rather, Gage, after

completing a full evaluation of Plaintiff and noting no pain or inability to move, sent Plaintiff

back to his cell, where he already had medical restrictions, and thus found it not believable that

he was suddenly in severe pain and could not walk immediately afterwards. *See Simpson v.*

*Town of Warwick Police Dep't*, 159 F. Supp. 3d 419, 446–47 (S.D.N.Y. 2016) (finding no

deliberate indifference where his injury was "not visible" to defendants and they "believed he

was faking his injury"); *McClinton v. Connolly*, No. 13-CV-2375, 2014 WL 5020593, at *5

(S.D.N.Y. Oct. 8, 2014) ("If the officers believed [the] [p]laintiff's asthma attack was a mere

ruse, they could not have been aware of a substantial risk that [the] [p]laintiff would suffer

serious harm."); *Hamilton v. Fisher*, No. 10-CV-1066, 2012 WL 987374, at *7 (N.D.N.Y. Feb.

29, 2012) (finding that "discharging [the] [p]laintiff—after a lengthy hospital stay—under the

suspicion that [the] [p]laintiff faked a suicide attempt in order to be removed from SHU might be

considered negligent . . . but that . . . is not sufficient to state an Eighth Amendment claim"),

*adopted by* 2012 WL 987122 (N.D.N.Y. Mar. 22, 2012); *Harris v. Morton*, No. 05-CV-1049,

2008 WL 596891, at *4 (N.D.N.Y. Feb. 29, 2008) ("[The defendant] did a head to toe

assessment and found nothing wrong with [the] [p]laintiff, and then advised [the] [p]laintiff to utilize the sick call procedure if he wanted to see a doctor." (internal quotation marks omitted)). Unlike with Furco, Plaintiff does not allege that Gage had an improper motivation for finding nothing wrong with him or believing he was faking; indeed, as alleged, Gage, the medical director, elected to personally evaluate Plaintiff because he had been to emergency sick call so often. *Cf. Chance*, 143 F.3d at 704 (noting that "ulterior motives" could demonstrate deliberate indifference).

Plaintiff also alleges that the next day, on April 17, 2014, Gage evaluated Plaintiff after he vomited at emergency sick call and said "I just s[aw] you yesterday," sent Plaintiff back to his cell, ordering an "officer to remove all medication from [P]laintiff." (FAC 6.) Again, the submitted exhibits render Plaintiff's deliberate indifference allegations implausible. The medical note written by a non-Defendant, and corroborated by Gage's notes, indicate that Gage sent Plaintiff away because he was "loud [and] argumentative" and would not let her examine him, and he was not taking his medications, but Gage told Plaintiff to return to emergency visit later anyway. (FAC 24–25; *see also id.* at 34 (same).) However, Plaintiff did not return for re-evaluation, instead running to the visitor's room. (*Id.* at 25, 34.) These facts do not show that Gage was aware of a substantial risk of harm from sending Plaintiff back to his cell, but consciously disregarded this risk. *See Mathews v. Pallito*, No. 12-CV-58, 2014 WL 4805333, at *11 (D. Vt. Sept. 26, 2014) (noting that noncompliance with prescribed treatment "presents a significant hurdle for [an] Eighth Amendment claim"); *Chavis v. Kienert*, No. 03-CV-0039, 2005 WL 2452150, at *23 (N.D.N.Y. Sept. 30, 2005) (finding no deliberate indifference where the "[p]laintiff's health record reveals that medical staff frequently saw him and that he often would request medical services and yet fail to appear," or would be belligerent and uncooperative with

medical staff).

The remaining allegations against Gage similarly fail to show deliberate indifference. Plaintiff alleges that Gage sent Plaintiff to see a psychologist, "which was uncalled for since [P]laintiff doesn't have '[a] history of mental health problems.'" (FAC 6.) However, at most, this claim is either one of "medical malpractice," which "is not actionable under § 1983," *Edwards v. Myres*, No. 09-CV-60, 2011 WL 4529367, at *4 (W.D.N.Y. Sept. 22, 2011) (citing *Daniels v. Williams*, 474 U.S. 327, 330–31 (1986)), or a "disagreement over the proper treatment," which does not raise a claim under the Eighth Amendment, *see Chance*, 143 F.3d at 703. Plaintiff does not allege that he was sent to the psychologist as punishment or in lieu of treatment for his hip problems. Rather, after he saw the psychologist for 5 minutes, Gage sent Plaintiff to the infirmary to be placed on bedrest. (FAC 6, 26.) While there, he was sent out for the bone scan. (*Id.* at 34.) After this date, Gage is not mentioned.

The Court therefore grants Gage's and Bigaud's Motion To Dismiss the Eighth Amendment claims against them, but grants in part and denies in part Furco's Motion on this claim.

### 3. Fourteenth Amendment Due Process Claim

Construing the Amended Complaint liberally, it alleges that Gage and Thayer violated Plaintiff's due process rights, because Gage filed false misbehavior reports against him and Thayer found Plaintiff guilty at his hearing for improper reasons. (FAC 6.) Defendants argue that Plaintiff has not stated a procedural due process claim. (Defs.' Mem. 22–23.)[15]

---

[15] Plaintiff did not address this argument in his opposition but, in light of his pro se status, the Court will not deem this claim abandoned. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 197–98 (2d Cir. 2014) (explaining, in the context of summary judgment, that "[w]here a partial response to a motion is made" by a pro se plaintiff, the "court should examine every claim . . . with a view to determining whether [judgment in favor of defendants] is legally and factually appropriate");

Gage filed three misbehavior reports against Plaintiff: (1) on April 16, 2014 after Plaintiff was writhing in the bullpen, (Misbehavior Report); (2) on April 17, 2014, after Plaintiff refused to cooperate with an interview and was "belligerent [and] evasive," refusing to obey Gage's "direction to stop talking," (FAC 9); and (3) on unspecified dates after Plaintiff was moved to the infirmary, (*id.* at 6). Even assuming these misbehavior reports were false, "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997); *see also Bey v. Griffin*, No. 16-CV-3807, 2017 WL 5991791, at *7 (S.D.N.Y. Dec. 1, 2017) ("It is well settled that a prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.") (alteration and internal quotation marks omitted)). Rather, the inmate must show something more, such as that he was deprived of due process during the resulting disciplinary hearing, or that the misbehavior report was filed in retaliation for the inmate's exercise of his constitutional rights." *Id.* (internal quotation marks omitted); *see also Boddie*, 105 F.3d at 862 (creating retaliation exception).

Plaintiff fails to satisfy this standard as to Gage, because he does not allege that Gage filed these reports in retaliation for him attempting to exercise a constitutional right; rather, construing Plaintiff's submissions liberally, he contends that Gage filed these reports because she believed Plaintiff was faking his pain, not permitting her to conduct her examination, and creating a disturbance in the medical unit. As explained above, Plaintiff does not have a constitutional right to do any of these things. *Cf. Willey v. Kirkpatrick*, 801 F.3d 51, 65–66 (2d

*Lipton v. Cty. of Orange, N.Y.*, 315 F. Supp. 2d 434, 446 (S.D.N.Y.2004) (although courts "may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed . . . [a]pplication of this proposition is, however, tempered by [the court's] discretion").

Cir. 2015) (reversing summary judgment on retaliation claim where the plaintiff alleged that the false reports were filed in response to his refusing to provide false information to police officers, which may be a constitutional right).  In any event, in the absence of "specific and detailed factual allegations" that Gage filed these reports in retaliation, the Court approaches this claim with "skepticism and particular care" and thus dismisses the due process claims against Gage. *See Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (internal quotation marks omitted).[16]

As for the due process Plaintiff received at the disciplinary hearing, Plaintiff alleges almost no facts about the hearing, including which misbehavior reports it covered.  He alleges only that "he was found guilty by Defendant Thayer," who said to him, "I would find you not guilty but she [(]Defendant Gage[)] is some[one] important."  (FAC 6.)  At this stage, however, the Court finds that this plausibly alleges a procedural due process claim against Thayer.  Due process requires that prisoners receive "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Lunca v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004).  Construing Plaintiff's allegations liberally, he alleges that Thayer thought, based on the evidence, that Plaintiff was innocent, but found him guilty anyway because of Gage's power, influence, or relationship to him.  (FAC 6.)   Thayer therefore was not a "fair and impartial hearing officer," but rather a biased one who failed to make a decision supported by the evidence, thereby violating Plaintiff's due process rights. *Luna*, 356 F.3d at 487; *see also Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989) ("[I]t axiomatic that a prison disciplinary hearing in which the result is arbitrarily and

---

[16] Plaintiff does not allege that Gage was present at or involved in the allegedly unfair hearing, so that exception cannot not save his claim against her.

adversely predetermined violates due process.").

Moreover, to the extent that Defendants argue Plaintiff possessed no liberty interest in this hearing because it did not "result[] in an atypical and significant hardship in relation to the ordinary incidents of prison life," *Luna*, 356 F.3d at 487 n.3 (alteration and internal quotation marks omitted), the Court disagrees, because Plaintiff was allegedly "isolated in the infirmary without clothing and pain medication and . . . the ess[]ential necessities" from April 17 through April 29, 2014, (FAC 6.)   *See Houston v. Cotter*, 7 F. Supp. 3d 283, 300 (E.D.N.Y. 2014) (finding that lack of food or prescription medications could constitute an atypical and significant hardship); *cf. Sandin v. Conner*, 515 U.S. 472, 486 (1995) ("The record shows that, at the time of [the plaintiff's] punishment, disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody.").[17] The Court therefore denies Thayer's Motion To Dismiss the due process claim against him.

## III. Conclusion[18]

For the foregoing reasons, Defendants' Motion To Dismiss is granted in part and denied in part.  The claims against Adeknami, Gage, and Bigaud, and all Eighth Amendment claims against Furco except for the claim relating to the first evaluation are dismissed.  The due process claim against Thayer is also not dismissed.  Because this is the first adjudication of Plaintiff's claims on the merits, the dismissal is without prejudice.  *See Terry v. Inc. Vill. Of Patchogue*,

---

[17] The Court notes, however, that this claim may face an insurmountable hurdle at the summary judgment stage in light of the documents Defendant submitted, including the purported hearing transcript and hearing disposition.  (*See* Defs.' Mem. Ex. C.)

[18] The Court declines to reach Furco's or Thayer's arguments that they are entitled to qualified immunity, (Defs.' Mem. 24), because, as this Court has recently warned Defendants' counsel, this defense must actually be *argued* in the briefing to merit consideration.  *See Whitley v. Bowden*, No. 17-CV-3564, 2018 WL 2170313, at *12 (S.D.N.Y. May 10, 2018).

826 F.3d 631, 633 (2d Cir. 2016) (explaining that "district judges should, as a general matter, liberally permit pro se litigants to amend their pleadings" unless "amendment would be futile").

Should Plaintiff choose to file a second amended complaint, he must do so within 30 days of this Opinion, addressing the deficiencies identified herein. The new amended complaint will replace, not supplement, the complaint currently before the Court. It therefore must contain *all* of the claims and factual allegations Plaintiff wishes the Court to consider. The Court will not consider factual allegations raised in supplemental declarations, affidavits, or letters. If Plaintiff fails to abide by the 30-day deadline, the dismissed claims could be dismissed with prejudice, and this case will proceed only with the due process claim against Thayer and the Eighth Amendment deliberate indifference claim for the first incident involving Furco.

The Clerk of the Court is respectfully requested to terminate the pending motion, (Dkt. No. 63), and to mail a copy of this Opinion to Plaintiff.

SO ORDERED.

Dated: June __, 2018
       White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE