UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TRAVIS JAMES,

                                    Plaintiff,

              v.                                        No. 15-CV-106 (KMK)

DANA GAGE, Medical Director F.H.S.D.; B.                OPINION AND ORDER
FURCO, Nurse-Administrator; ALBERT
ADEKNAMI, Nurse; BIGAUD, Provider;
and LIEUTENANT THAYER,

                                    Defendants.

Appearances:

Travis James
Ossining, NY
*Pro Se Plaintiff*

Janice Powers, Esq.
Office of the New York State Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Pro se Plaintiff Travis James ("Plaintiff") filed the instant Second Amended Complaint

("Second Amended Complaint"), pursuant to 42 U.S.C. § 1983, against Medical Director Dana

Gage ("Gage"), Nurse Barbara Furco ("Furco"), Nurse Albert Adeknami ("Adeknami"),

provider Bigaud ("Bigaud"), and Lieutenant Thayer ("Thayer") (collectively, "Defendants").

(Second Am. Compl. ("SAC") (Dkt. No. 83).)  Plaintiff alleges that Defendants violated his

rights under the Eighth and Fourteenth Amendments because they were deliberately indifferent

to his need for hip replacement surgery and punished him with false misbehavior reports and

keeplock confinement for seeking medical treatment.  (*See generally id.*)

Before the Court is Defendants' Partial Motion To Dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* Defs.' Not. of Mot. ("Defs.' Mot.") (Dkt. No. 90).)[1] For the following reasons, Defendants' Motion is granted in part and denied in part.

## I. Background

### A. Factual Background

The following facts are drawn from Plaintiff's Second Amended Complaint, (*see* SAC), and Plaintiff's opposition to the Motion To Dismiss, (Pl.'s Mem. of Law in Opp'n to Mot. To Dismiss ("Pl.'s Mem.") (Dkt. No. 93)), which are taken as true for the purpose of resolving the instant Motion, as well as the Court's June 5, 2018 Opinion and Order on Defendants' motion to dismiss the First Amended Complaint ("FAC"), (June 5, 2018 Op. & Order ("Opinion") (Dkt. No. 82)). During the time of the alleged events, Plaintiff was a convicted prisoner at Sing Sing Correctional Facility in Ossining, New York ("Sing Sing"). (Opinion 2.)

In 2004, Plaintiff had hip replacement surgery. (SAC ¶ 1.)[2] Ten years later, on February 3, 2014, he began experiencing "extreme pain" in the hip replacement area. (*Id.*) Plaintiff therefore "put down for emergency sick call to have his hip evaluated." (*Id.*) On March 3, 2014 at 1:45 a.m., Plaintiff went to emergency sick call because he "continued to experience extreme pain and requested to see a specialist to be given a CAT-SCAN," but the request was denied;

---

[1] Defendants do not move to dismiss Plaintiff's claim against Thayer, (Defs.' Reply in Further Supp. of Mot. To Dismiss ("Defs.' Reply") 9 (Dkt. No. 94)), as the Court already found Plaintiff stated a due process claim against him, (June 5, 2018 Op. & Order ("Opinion") 36 (Dkt. No. 82)).

[2] All citations to paragraph numbers in the Second Amended Complaint refer to the section entitled "Facts." For references to all other sections, the Court will cite to the page number to avoid confusion.

Plaintiff does not specify who denied this request.  (*Id.* ¶ 2.)  Later that day, at 6:30 a.m., Plaintiff returned to emergency sick call "because the pain in his hip had grown unbearable."  (*Id.* ¶ 3.)  There, he explained to Defendant Furco that his pain was unbearable and that it "was hard to walk [or] stand up."  (*Id.*)  Furco argued with Plaintiff and told him that nothing was wrong with him, saying, "you just want to sue," and sent Plaintiff back to his cell.  (*Id.*)

On March 8, 2014, Plaintiff explained to Furco that the pain had "grown worse," that it was hard for him to walk, and that "his hip hurt every time he stood on it."  (*Id.* ¶ 4.)[3]  Plaintiff requested medication, a cane, or crutches; Furco responded, "I am not giving you anything, go back to your housing area."  (*Id.*)  However, the pain subsequently "became persistent and made it very difficult to stand up," leading Plaintiff to "put down for emergency sick call" again on March 9, 2014.  (*Id.* ¶ 5.)  Plaintiff saw Furco again, who stated that "there wasn't anything wrong with [P]laintiff" and told the Clinic Officer to "remove [P]laintiff from the Clinic because [P]lantiff had a non-medical issue."  (*Id.*)  On March 10, 2014, Plaintiff was still in "extreme pain" and "had difficulty standing and walking."  (*Id.* ¶ 6.)  He went to emergency sick call but "was sent back to his cell," although it is not clear who sent Plaintiff back to his cell.  (*Id.*)

On March 21, 2014 at 6:55 a.m., Plaintiff "was experiencing extreme pain in his left hip and went to emergency sick call."  (*Id.* ¶ 7.)  Defendant Adeknami administered 200 milligrams of Ibuprofen to Plaintiff.  (*Id.*)  Plaintiff went to emergency sick call again on March 25, 2014, where he was seen by Defendant Bigaud.  (*Id.* ¶ 8.)  Plaintiff told Bigaud that he was experiencing pain in his left hip and had difficulty walking, and requested a cane.  (*Id.*)  He also informed Bigaud that the Ibuprofen he had received "was not working."  (*Id.*)  Bigaud "denied

---

[3] It is not clear where this conversation happened: the Second Amended Complaint simply states, "March 8, 2014, from the chapel at 10:30 or 11:00 AM."  (SAC ¶ 4.)

[P]laintiff[] and sent him back to his cell." (*Id.*) On March 26, 2014 at 4:15 a.m., Plaintiff went

back to emergency sick call "because of the extreme pain he was having in his left hip." (*Id.*

¶ 9.) There, Adeknami "said that [P]laintiff had seen his provider the previous day," but

nonetheless gave Plaintiff a "call-out" for 9:00 a.m. to see Bigaud. (*Id.*) At 9:40 a.m. the same

day, Plaintiff indeed went to see Bigaud, who "became upset because [P]laintiff had come back

again," stating, "I just seen you yesterday." (*Id.* ¶ 10.) Bigaud allegedly "wrote down the

opposite of what [P]laintiff said to him on three triage papers," although there is no indication of

what Plaintiff said or what Bigaud wrote. (*Id.*)

On March 28, 2014 at 3:25 p.m., Plaintiff went to emergency sick call again, complaining

of "numbness in his left hip" that had begun two days prior. (*Id.* ¶ 11.) Plaintiff "was then

move[d] to the Flats but was not given a cane or crutches." (*Id.*)[4] On March 30, 2014 at 9:00

a.m., Plaintiff went to emergency sick call and was seen by Furco. (*Id.* ¶ 12.) Plaintiff

complained of "extreme pain" and requested an MRI or that he be provided with a cane. (*Id.*)

Furco "became upset, began to argue with [P]laintiff, stated that 'nothing was wrong with him'

but wrote [P]laintiff a call[-]out" to see Bigaud, then sent Plaintiff back to his housing unit. (*Id.*)

Plaintiff met with Bigaud the next day and informed him that Plaintiff "could not lift his leg

because he had been walking on it in pain since February 3, 2014," and said that he needed a

cane or crutches, but the request was denied. (*Id.* ¶ 13.)

On April 3, 2014, Plaintiff was seen by "specialist Holder" ("Dr. Holder") and "sent back

to his housing unit." (*Id.* ¶ 14.) On April 4, 2014 at 6:35 a.m., Plaintiff "had to be helped by an

inmate to emergency sick call" because of his ongoing pain. (*Id.* ¶ 15.) When he arrived,

Adeknami sent him back to his cell "and stated that nothing was wrong with him." (*Id.*) The

---

[4] Plaintiff does not specify what "the Flats" are.

same day, at 10:10 a.m., Plaintiff "went to the clinic" and saw Bigaud, who "began to argue with [P]laintiff and stated that [P]laintiff had seen a specialist the day before who recommended a cane" and that Plaintiff be moved to "the Flats." (*Id.* ¶ 16.) Bigaud "wrote a No-Visit pass" and stated that he "did not want [P]laintiff walking more than fifty feet." (*Id.*) Plaintiff alleges that Bigaud also told him that Holder's examination had showed that Plaintiff had "loosening of the prosthetic in his left hip" and that his leg had gotten worse since his initial complaints in February 2014. (*Id.*) Plaintiff asked Bigaud if he could be admitted "into the facilities hospital" and if Bigaud could provide him with a cane, but "[t]he request was denied." (*Id.*)

On April 6, 2014 at 9:15 a.m., Plaintiff was brought to the clinic in a wheelchair after Officer Tippet ("Tippet") "called about his emergency." (*Id.* ¶ 17.) Plaintiff explained to an unnamed nurse that he was in "extreme pain," and the nurse called Dr. Ferdous ("Dr. Ferdous"), who admitted Plaintiff into the "facilities hospital" (the "hospital"). (*Id.*) He was released from the hospital, but does not specify how long he stayed there. (*Id.* ¶ 18.)

On April 13, 2014, Plaintiff again went to emergency sick call "in extreme pain" and also with a fever. (*Id.* ¶ 19.) Adeknami notified Dr. Slam ("Dr. Slam"), administered 500 milligrams of Robaxin, and scheduled Plaintiff to see "PA Muthra" ("Muthra"). (*Id.*) Plaintiff went to emergency sick call again on April 14, 2014 complaining of extreme pain in his left hip, but "was sent back to his cell with no medical attention provided by Adeknami." (*Id.* ¶ 20.) On April 15, 2014 at 9:30 a.m., Plaintiff "was carried to the facilities clinic by an inmate because he could not walk and was in extreme pain." (*Id.* ¶ 21.) He was evaluated by Adeknami, who determined he had a high fever and a blood pressure reading of 145/80. (*Id.*) Approximately one hour later, at 10:25 a.m., Plaintiff still had a high fever and was experiencing pain, but his blood pressure reading was now 130/80. (*Id.* ¶ 22.) Adeknami called Defendant Gage at home,

and Gage told Adeknami to "write out" a psychiatric consult, give Plaintiff Naprosyn for his pain, and return Plaintiff to his housing unit "without crutches or [a] cane." (*Id.*)

On April 16, 2014 at 10:00 a.m., Plaintiff went to emergency sick call, still experiencing pain in his left hip. (*Id.* ¶ 23.) Gage "began to argue with [P]laintiff about his continued complaints and coming to emergency sick call so much." (*Id.*) Gage asked Officer Sullivan ("Sullivan") to "write [P]laintiff a misbehavior report and escort [P]laintiff out of the facility clinic." (*Id.*) Officer Sullivan said he would not do so, explaining that Plaintiff "was in pain" and saying that Gage "was not his boss." (*Id.*) Gage nevertheless issued a misbehavior report and placed Plaintiff on "Keeplock status," citing Plaintiff for three violations: "Refusing a Direct Order," "Failure to Follow Direction," and "Disturbance." (*Id.* ¶ 24.) Gage did not provide Plaintiff with any pain medication, crutches, or a cane, and Plaintiff had to be helped back to his cell by two inmates. (*Id.*)

On April 17, 2014, Plaintiff went back to emergency sick call at 9:45 a.m., escorted by Officer Castle ("Castle"). (*Id.* ¶ 25.) Upon entering the facility emergency room, Plaintiff vomited in a garbage can "because of the pain in his left hip." (*Id.*) Gage "became upset" and told Castle to remove Plaintiff from the clinic and write a misbehavior report "without examining [P]laintiff or providing any form of medical attention." (*Id.*) Plaintiff was taken back to his cell "without any pain medication or medical attention," remained on keeplock status, and was issued another misbehavior report by Gage. (*Id.* ¶ 26.) Later that day, at 11:45 a.m., Plaintiff returned to emergency sick call and said that he needed to "be sent to the outside hospital," but Gage "refused to see him." (*Id.*) Instead, Gage ordered Plaintiff to be placed on "strict bed-rest as well as keeplock status." (*Id.* ¶ 27.) That same day, Plaintiff received a visit from his family, and "was made to walk to the facility visitroom, which is approximately a half-mile walk with

. . . numerous stairs exceeding 80 steps . . . , in extreme pain [and] without crutches, cane, or facility bus pass." (*Id.* ¶ 28.) While visiting with his family, Plaintiff spoke with Sgt. Johnson ("Johnson") and explained that "his leg was hurting"; at Plaintiff's request, Johnson made a phone call and Plaintiff was admitted to the hospital. (*Id.* ¶ 29.) Gage "became u[p]set" because of Plaintiff's conversation with Johnson, and in response "had [P]laintiff admitted to a Keeplock isolation hospital room with no property, phones, [or] TV," and had him "heavily medicated to the point that [P]laintiff had no idea as to where he was for a total of twenty days." (*Id.*) While Plaintiff was in isolation, Adeknami was the late night facility nurse, and refused to provide Plaintiff with pain medication "even though [P]laintiff informed him that he was in extreme pain and call[ed] for help in the infirmary." (*Id.* ¶ 31.) On April 19, 2014, Plaintiff received a misbehavior report dated April 17, 2014, the day he was placed in the hospital. (*Id.* ¶ 30.) The report was written by Gage and charged Plaintiff with four violations: failure to obey a direct order, verbal interference with medical personnel, giving incomplete or misleading information, and "conduct disruptive to functioning unit." (*Id.*)

On April 26, 2014, Plaintiff "went on an outside trip" and underwent a bone scan. (*Id.* ¶ 32.) Upon his return, Plaintiff "was still isolated in the Hospital without clothing, pain medication, cane, crutches, or any essential necessities" until April 29, 2014. (*Id.*) On May 2, 2014 at 6:45 a.m., Plaintiff went to emergency sick call, where he told Adeknami that he was still experiencing extreme pain in his left hip, and asked about the status of his bone scan. (*Id.* ¶ 33.) Adeknami "could not tell [P]laintiff anything" about his bone scan, and "did not provide any medical assistan[ce] and sent [P]laintiff back to his cell." (*Id.*) On May 5, 2014 at 12:21 a.m., Plaintiff went to emergency sick call and again complained to Adeknami about the extreme pain in his left hip, but was not given "any form of medical assistance"; however, Adeknami

gave Plaintiff a slip to see his medical provider. (*Id.* ¶ 34.) On May 6, 2014 at 12:05 a.m., Plaintiff went to emergency sick call and once again complained to Adeknami about his hip pain. This time Adeknami called Slam at home, who told him to give Plaintiff 500 milligrams of Robaxin, "and a slip for his Provider later in the morning." (*Id.* ¶ 35.) On May 7, 2014, Plaintiff "had a medical call[-]out" with an unnamed doctor about his condition, "but the escort [o]fficer never came to take him to the appointment." (*Id.* ¶ 36.)

On May 10, 2014, Plaintiff went to emergency sick call complaining of the same left hip pain. (*Id.* ¶ 37.) Plaintiff was examined, and it was determined that he had a "high fever" with a blood pressure reading of "126 over 82." (*Id.*) He was then allowed to see Muthra. (*Id.*) The same day, Defendant Thayer "commenced both of [P]laintiff['s] hearings" pertaining to the misbehavior reports dated April 16, 201[4] and April 17, 2014. (*Id.* ¶ 38.) At the conclusion of the hearings, Thayer told Plaintiff, "I would find you not guilty but Gage is someone important." (*Id.*) Plaintiff "was found guilty of all charges" and was "sanctioned with a 30-day loss of Packages, Commissary, and Phones." (*Id.*)

On May 12, 2014 at 10:15 a.m., Plaintiff went to emergency sick call "because he was still in pain." (*Id.* ¶ 39.) An unidentified John Doe nurse returned Plaintiff to his housing unit without medical assistance. (*Id.*) On May 25, 2017 at 8:40 a.m., Plaintiff went to emergency sick call again "because he was still in pain and [had a] fever." (*Id.* ¶ 40.) Again, an unidentified John Doe nurse returned Plaintiff to his housing unit, saying "he could not do anything." (*Id.*) Plaintiff returned to emergency sick call on May 26 and 27, June 9, 10, 16, and 17, and "a number of times until October 7, 2014 when [P]laintiff received a [h]ip-replacement surgery." (*Id.* ¶ 41.)

In total Plaintiff went to the emergency sick call approximately 33 times complaining of "intense pain." (*Id.* at 8.) Plaintiff was "[f]orce[d] to walk in extreme pain" and was not "provided with proper medical equipment, i.e., 'crutches, cane, wheelchair, or bus pass.'" (*Id.*) Plaintiff seeks $1,000,000 in compensatory damages and $1,000,000 in punitive damages. (*Id.* at 9.)

B. Procedural Background

Plaintiff filed an initial Complaint against Furco, Gage, and Abe Kanari on January 6, 2015. (Compl. (Dkt. No. 2).) He was granted in forma pauperis status on January 22, 2015. (Dkt. No. 4.) On January 29, 2015, the Court issued an Order directing service on those Defendants. (Order of Service (Dkt. No. 6).) Furco and Gage were properly served, (Dkt. Nos. 13, 14), but service on Abe Kanari was unsuccessful, (Dkt. No. 15). Plaintiff therefore requested that the Court issue an order pursuant to *Valentin v. Dinkins*, 121 F.3d 72 (2d Cir. 1997), to determine the correct name of the nurse he had called "Abe Kanan" or "Abacondi," (Letter from Plaintiff to Court (May 6, 2015) (Dkt. No. 16)), which the Court did, (Order (Dkt. No. 17)). In response, on June 10, 2015, Defendants filed a letter identifying Albert Adeknami and providing his service address. (Letter from Jason M. Clark, Esq. to Court (June 10, 2015) (Dkt. No. 28).)

Additionally, on June 2, 2015, Defendants filed a pre-motion letter indicating the grounds on which they would move to dismiss the Complaint. (Letter from Jason M. Clark, Esq. to Court (June 2, 2015) (Dkt. No. 27).) The Court held a pre-motion conference at which it granted Plaintiff leave to file an amended complaint by November 13, 2015, (*see* Dkt. (entry for Sept. 24, 2015)), which Plaintiff did, this time also naming Albert Adeknami, Bigaud, and Thayer as Defendants, (First Am. Compl. (Dkt. No. 39)). These Defendants were served. (*See* Dkt. Nos. 44–46.)

On January 27, 2016, Defendants filed an Answer. (Dkt. No. 49.) On August 25, 2017, Defendants filed a pre-motion letter indicating the grounds on which they would move to dismiss the First Amended Complaint. (Dkt. No. 58.) Pursuant to a briefing schedule set by the Court, (Dkt. Nos. 59, 61), Defendants filed a Motion To Dismiss on October 13, 2017, (Dkt. No. 63). The Court permitted Defendants to provide the Court with the unredacted accompanying papers without uploading them on ECF, because they contained Plaintiff's confidential medical records. (Dkt. No. 65.) However, the Court later permitted Defendants to file the unredacted Motion under seal and ordered them to file redacted copies on ECF. (*See* Dkt. Nos. 78–81.) Plaintiff filed an opposition on February 20, 2018. (Pl.'s Mem; *see also* Dkt. Nos. 67, 68 (extensions).) The same day, Plaintiff filed a motion for leave to amend, (Dkt. No. 70), which the Court denied because "[n]o reasons for the amendment of this three-year-old case [we]re provided and there is a pending motion to dismiss," (Dkt. No. 71). Defendants filed a reply on April 13, 2018. (Dkt. No. 74.)

On June 5, 2018, the Court issued an Opinion and Order granting in part and denying in part Defendants' motion to dismiss. (*See* Opinion.) The Court first dismissed Plaintiff's claims against Adeknami for lack of personal involvement in the alleged constitutional violations. The Court noted that Adeknami "is not mentioned in the Amended Complaint," but that Plaintiff argued in his opposition that Adeknami is "listed as 'John Doe,'" and added specific allegations of dates that Adeknami met with Plaintiff but provided insufficient medical care. (Opinion 15.) The Court found that Plaintiff's assertion that Adeknami was the "John Doe" mentioned in the Amended Complaint was "not plausible" in light of the fact that Adeknami "has been a named Defendant in this Action since Plaintiff filed the initial Complaint on January 6, 2015," yet was never named in the Amended Complaint. (*Id.*) Additionally, the Court noted that Plaintiff had

recounted specific details about Adeknami in a May 6, 2015 letter to the Court, but that several of Plaintiff's allegations referenced a "Defendant Jane *or* John Doe," and found that it was "neither plausible nor consistent with the allegations in the Amended Complaint to infer that Plaintiff, who has always known Adekami was male, would have referred to him as a Jane Doe." (*Id.* at 15–16.)

The Court then moved on to Plaintiff's Eighth Amendment claims, dismissing all but Plaintiff's claim based on Furco's alleged denial of treatment and statement on one occasion that Plaintiff sought medical care that he knew Plaintiff did not need medical treatment and "just wants to sue." (*Id.* at 27.) The Court found that Furco's comment "evinces an ulterior motive to not treat Plaintiff, despite knowing he is in pain." (*Id.*) However, with respect to all other Eighth Amendment claims, the Court, relying heavily on the medical records and documents Plaintiff had attached to the First Amended Complaint, held that Plaintiff failed to state a claim because the allegations, viewed in conjunction with the medical records, did not constitute deliberate indifference under the Eighth Amendment. (*See id.* at 26–33.) The Court repeatedly noted that the exhibits Plaintiff submitted rendered many of his allegations implausible. (*See id.* at 28–32.)

Finally, the Court found that Plaintiff had sufficiently pled his Fourteenth Amendment procedural due process claim against Thayer, based on the allegation that Thayer "thought, based on the evidence, that Plaintiff was innocent, but found him guilty anyway because of Gage's power, influence, or relationship to him." (*Id.* at 35–36.) The Court dismissed Plaintiff's claims without prejudice, giving leave to amend within 30 days. (*Id.* at 36–37.)

Plaintiff timely filed his Second Amended Complaint on July 6, 2018. (SAC.) With leave of the Court, (Dkt. No. 85), Defendants moved to dismiss on August 24, 2018, (Defs.' Mot.; Defs.' Mem. of Law in Supp. of Mot. To Dismiss ("Defs.' Mem.") (Dkt. No. 91)). After

being granted a 30-day extension, (Dkt. No. 92), Plaintiff filed a response on November 6, 2018, (Pl.'s Mem. of Law in Opp'n to Mot. To Dismiss ("Pl.'s Mem.") (Dkt. No. 93)). Defendants filed a reply on November 16, 2018. (Defs.' Reply in Further Supp. of Mot. To Dismiss ("Defs.' Reply") (Dkt. No. 94).)

## II. Discussion

### A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than

the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering Defendants' Motion To Dismiss, the Court is required to "accept as true all of the factual allegations contained in the [C]omplaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). And, the Court must "draw[] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Where, as here, a plaintiff proceeds pro se, the Court must "construe[] [his complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedure and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted). However, when the complaint is drafted by a pro se plaintiff, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4

n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including, "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), and "documents either in [the] plaintiff[']s possession or of which [the] plaintiff[] had knowledge and relied on in bringing suit," C*hambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

Additionally, although true that "an amended complaint ordinarily supersedes the original, and renders it of no legal effect," *Baja Food Servs. S. De RL De DV v. Peanut Butter & Co., Inc.*, No. 14-CV-5290, 2015 WL 1137486, *3 (S.D.N.Y. 2015) (quoting *Dluhos v. Floating & Abandoned Vessel, Known as New York*, 162 F.3d 63, 68 (2d Cir. 1998)), in cases "where allegations in an amended pleading 'directly contradict' pleadings in the original complaint, courts have disregarded the amended pleading," *Brooks v. 1st Precinct Police Dep't*, No. 11-CV-6070, 2014 WL 1875037, at *2 (E.D.N.Y. May 9, 2014) (citation omitted); *see also Kilkenny v. Law Office of Cushner & Garvey, L.L.P.*, No. 08-CV-588, 2012 WL 1638326, at *5 (S.D.N.Y. May 8, 2012) ("There is authority supporting the notion that a court may disregard amended pleadings when they directly contradict facts that have been alleged in prior pleadings."); *Palm Beach Strategic Income, LP v. Salzman*, No. 10-CV-261, 2011 WL 1655575, at *5 (E.D.N.Y. May 2, 2011) (noting that "a district court has no obligation to accept as true an amended complaint's allegations, if they directly contradict the facts set forth in his original complaint" (citation, alteration, and quotation marks omitted)), *aff'd,* 457 F. App'x 40 (2d Cir. 2012); *Wallace v. N.Y.C. Dep't of Corr.*, No. 95-CV-4404, 1996 WL 586797, at *2 (E.D.N.Y. Oct. 9, 1996) (dismissing pro se amended complaint based on facts "set forth in his original complaint" where the plaintiff "blatantly change[d] his statement of the facts in order to respond to the defendants' motion to dismiss").

Here, Plaintiff has not asserted contradictory facts in his amended pleading; instead, Plaintiff has omitted the exhibits he attached to the First Amended Complaint and his opposition to Defendants' Motion To Dismiss the First Amended Complaint, which the Court found contradicted many of Plaintiff's allegations and relied on in dismissing several of Plaintiff's claims. (*See* Opinion 26–33.) The Court finds that this case is "the kind of rare occasion" in which it is appropriate "to depart from th[e] usual rule" that an amended complaint supersedes all prior complaints. *Salzman*, 2011 WL 1655575, at *5–6. Although there can be "valid reasons why a plaintiff would amend a complaint in a contradictory fashion," *id.* at *6, "[w]here a plaintiff blatantly changes his statement of the facts in order to respond to the defendant's motion to dismiss and directly contradicts the facts set forth in his original complaint, a court is authorized to accept the facts described in the original complaint as true," *Colliton v. Cravath, Swaine & Moore LLP*, No. 08-CV-400, 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008) (citation, quotation marks, and alterations omitted), *aff'd*, 356 F. App'x 535 (2d Cir. 2009). This is particularly appropriate here, where Plaintiff relied on the facts demonstrated by exhibits attached to his First Amended Complaint, rather than merely allegations in the complaint, and the Court found that the facts reflected in those exhibits contradicted the Complaint's allegations. *See Poindexter v. EMI Record Grp. Inc.*, No. 11-CV-559, 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012) ("If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true." (citation omitted)). Those exhibits will inevitably become part of the evidentiary record during discovery, and the Court will thus be required to consider them as evidence at the summary judgment stage, unlike prior inconsistent pleadings in a complaint which are "controvertible, not conclusive, admissions." *Zitz v. Pereira*, 119 F. Supp.

2d 133, 140 (E.D.N.Y. 1999) (citation omitted); *see also Jenkins v. Chase Bank USA, N.A.*, No. 14-CV-5685, 2015 WL 4988103, at *1 n.1 (E.D.N.Y. Aug. 19, 2015) ("The Court may . . . draw on facts alleged in the [c]omplaint and [a]mended [c]omplaint because even though the [s]econd [a]mended [c]omplaint is the operative pleading, the [c]ourt may still credit admissions in the original complaint and attached exhibits." (citation, alteration, and quotation marks omitted)); *Poindexter*, 2012 WL 1027639, at *2 ("[E]ven though the Amended Complaint is the operative pleading, the Court may still credit admissions in the original complaint and attached exhibits" (citation omitted)); *Torres v. Howell*, No. 03-CV-2227, 2006 WL 1525942, at *2 (D. Conn. May 30, 2006) (considering on a motion to dismiss "the . . . facts from [the plaintiff's] amended complaint and the exhibits attached to both his original and amended complaints" (citing *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 13 n.3 (2d Cir. 2001))). The Court therefore finds it appropriate to consider the exhibits attached to Plaintiff's First Amended Complaint and his opposition to Defendants' motion to dismiss that Complaint in deciding the instant Motion.

B.  Analysis

1.  Eighth Amendment Claim

Plaintiff alleges that Defendants Furco, Gage, Bigaud, and Adeknami were deliberately indifferent to his medical needs by unreasonably delaying the treatment of, and necessary replacement surgery for, his hip.  (*See* Pl.'s Mem. 5–8.)  Defendants argue that all Plaintiff's allegations are identical to the Eighth Amendment claims that the Court already dismissed, or otherwise fail to state a claim.  (Defs.' Mem. 3–10.)

a.  Applicable Law

"The Eighth Amendment forbids 'deliberate indifference to serious medical needs of prisoners.'"  *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013)

(quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  To state a deliberate indifference claim, Plaintiff must plausibly allege (1) "that he suffered a sufficiently serious constitutional deprivation," and (2) that Defendants "acted with deliberate indifference."  *Feliciano v. Anderson*, No. 15-CV-4106, 2017 WL 1189747, at *8 (S.D.N.Y. Mar. 30, 2017).

"The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious."  *Spavone*, 719 F.3d at 138 (quotation marks omitted).  In other words, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health."  *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013).  Analyzing this objective requirement involves two inquiries: "whether the prisoner was actually deprived of adequate medical care," *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006), and "whether the inadequacy in medical care is sufficiently serious," which in turn "requires the [C]ourt to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner," *id.* at 280.  "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition."  *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003).  Nevertheless, the Second Circuit has suggested the following non-exhaustive list of factors to consider when evaluating an inmate's medical condition: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'"  *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).  "When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in

analyzing whether the alleged deprivation is, in objective terms, sufficiently serious, to support an Eighth Amendment claim." *Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003) (quotation marks omitted).

"The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care." *Spavone*, 719 F.3d at 138. This means that the defendant must "appreciate the risk to which a prisoner was subjected," and have a "subjective awareness of the harmfulness associated with those conditions." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017); *see also Nielsen v. Rabin,* 746 F.3d 58, 63 (2d Cir. 2014) ("Deliberate indifference is a mental state equivalent to subjective recklessness," and it "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." (quotation marks omitted)). In other words, "[i]n medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Id.* (quotation marks omitted). However, "mere negligence" is insufficient to state a claim for deliberate indifference. *Walker*, 717 F.3d at 125 (quotation marks omitted). Moreover, "mere disagreement over the proper treatment [does not] . . . create a constitutional claim," and accordingly, "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703.

### b. Application to Plaintiff's Claims

Plaintiff's Second Amended Complaint includes more specific allegations in support of his Eighth Amendment claims. The Court construed Plaintiff's First Amended Complaint as asserting two deliberate indifference claims: "one relating to the delay in receiving hip

replacement surgery, and one relating to the ongoing treatment he received for his hip pain."
(Opinion 20.) The Second Amended Complaint, liberally construed, asserts the same two
deliberate indifference claims.

### i. Delayed Surgery

Plaintiff's Second Amended Complaint alleges that he began going to emergency sick
call in February 2014 complaining of pain in his hip. (SAC ¶ 1.) On April 3, 2014, Plaintiff was
evaluated by Dr. Holder, and on April 4, 2014, Bigaud allegedly informed Plaintiff that Dr.
Holder's examination "showed that he had 'loosening of the prosthetic in his left hip' and that
his leg had gotten wors[e] since [P]laintiff first complained in February 2014." (*Id.* ¶¶ 14, 16.)
On April 6, 2014, Plaintiff was brought to the clinic and, after indicating he was in extreme pain,
was admitted into the hospital. (*Id.* ¶ 17.) By at least April 14, 2014, a bone scan appointment
had been scheduled to evaluate Plaintiff's hip. (Opinion 22; Defs.' Orig. Mem. of Law in Supp.
of Mot. To Dismiss Ex. A ("FAC"), at 19 (Dkt. No. 80).)[5] On April 26, 2014, Plaintiff "went on
an outside trip and underwent a [b]one sc[an]." (SAC ¶ 32.) On May 5, 2014, Plaintiff's bone
scan results were received and reflected "prosthetic loosening" and "[d]egenerative changes in
[his] bilat[eral] knees," but "no evidence of osteomyelitis." (Opinion 22; FAC 27.) The day that

---

[5] Plaintiff's First Amended Complaint was filed as multiple documents, some of which
are exhibits which restart the ECF pagination. For ease of reference, when citing to the First
Amended Complaint, the Court will cite to the ECF-generated page numbers in the version
provided as an exhibit to Defendants' original memorandum of law in support of their motion to
dismiss the First Amended Complaint, because it contains consistent pagination for the entire
document. (Defs.' Mem. of Law in Supp. of Mot. To Dismiss (Dkt. No. 80) Ex. A ("FAC").)
The Court notes that this version of Defendants' original memorandum filed on the docket is
redacted, but an unredacted version, including all of the exhibits relevant to this Motion, was
filed under seal. (*See* Dkt. (entry for May 11, 2018).) When citing to the exhibits in Plaintiff's
original opposition, the Court will cite to the ECF-generated page numbers, which re-start with
each exhibit. (*See* Pl.'s Orig. Mem. of Law in Opp'n to Defs.' Mot. To Dismiss ("Pl.'s Orig.
Mem.") (Dkt. No. 69).)

Plaintiff's bone scan results were received, a request for an orthopedic consult was submitted, and the following day a doctor was notified about Plaintiff's pain and he was prescribed medication. (Opinion 23; FAC 27.) On May 14, 2014, medical notes reflect that Plaintiff was "awaiting [an] orthopedic surgeon," and a June 25, 2014 medical note signed by Bigaud noted, "surgery RBD 7/6." (Opinion 23; FAC 28, 30.) Plaintiff ultimately received his hip replacement surgery at an outside hospital on October 7, 2014. (SAC ¶ 41.)

Plaintiff argues that the six-month delay in receiving his surgery states a deliberate indifference claim, asserting that the delay caused him to "experience extreme pain," and that his condition "worsened over time." (Pl.'s Mem. 6.) Plaintiff's experience of extreme pain during his delay in treatment and the alleged decline in his condition are sufficient to meet the objective prong of his deliberate indifference claim for delay in receiving surgery. *See Ferguson v. Cai*, No. 11-CV-6181, 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012) ("Where temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in this Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness." (citing *Salahuddin*, 467 F.3d at 281)).

However, Plaintiff has not alleged facts that suggest any Defendants "knew of and disregarded an excessive risk to [Plaintiff's] health or safety." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (alterations and quotation marks omitted), *overruled on other grounds by Darnell*, 849 F.3d 17. For example, Plaintiff does not allege that any Defendant refused to schedule surgery for Plaintiff upon learning from his bone scan that his prosthetic was loose. *See Kucharczyk v. Westchester County*, 95 F. Supp. 3d 529, 542 (S.D.N.Y. 2015) (denying motion to dismiss deliberate indifference claims where a defendant told the plaintiff that "the surgery was

not going to happen because [the] [p]laintiff's injuries were not life threatening, and he would therefore have to wait to receive surgery until he was transferred or . . . released"); *Lloyd v. Lee*, 570 F. Supp. 2d 556, 569 (S.D.N.Y. 2008) (denying motion to dismiss where doctors "knew that [the plaintiff] was experiencing extreme pain and loss of mobility," but "[n]ine months went by after [an] MRI was first requested before the MRI was actually taken," resulting in the plaintiff experiencing ongoing pain for over a year); *Benjamin v. Schwartz*, 299 F. Supp. 2d 196, 201 (S.D.N.Y. 2004) (denying motion to dismiss where the plaintiff alleged doctor "*deliberately* failed to schedule him for needed surgery for almost two years, well knowing that excessive delay could mean permanent disability" (emphasis added)); *see also Dotson v. Fischer*, 613 F. App'x 35, 38 (2d Cir. 2015) (denying motion to dismiss where the defendants "reviewed [a doctor's] evaluation and recommendation that [the plaintiff's] condition demanded 'urgent' care and rejected it, apparently without causing him to be examined again in person or taking any further step," resulting in a year-long delay in the plaintiff's needed surgery). Indeed, Plaintiff could not make such allegations because, as discussed above, the medical documents he previously submitted reflect ongoing efforts to have Plaintiff evaluated and scheduled for surgery. *See Bennett v. Care Correction Sol. Med. Contracter*, No. 15-CV-3746, 2017 WL 1167325, at *8 (S.D.N.Y. Mar. 24, 2017) (granting motion to dismiss where the plaintiff had "not alleged any conduct or behavior that would suggest the delay was *caused* by Defendants' deliberate indifference" and surgery was only delayed by three months) (emphasis added), *appeal dismissed*, No. 17-1011, 2018 WL 1756123 (2d Cir. Jan. 9, 2018); *Myrie v. Calvo*, 615 F. Supp. 2d 246, 248 (S.D.N.Y. 2009) (granting motion to dismiss deliberate indifference claim where "[n]o facts are pleaded tending to show that [the] defendant . . . took affirmative steps to ensure that [the plaintiff] would not receive his [medical] treatment"); *cf.*

*Madera v. Ezekwe*, No. 10-CV-4459, 2013 WL 6231799, at *12 (E.D.N.Y. Dec. 2, 2013) ("Courts have . . . refused to find deliberate indifference where delays in treatment were caused by circumstances that were outside the control of the charged officials. The logistical difficulties involved in scheduling outpatient appointments and transporting prisoners to outside facilities can present one such circumstance."). This case is thus "similar to other cases where prisoners merely allege a delay in the provision of medication or treatment, but fail to allege that the delay was either intentional or reckless." *Bell v. Jendell*, 980 F. Supp. 2d 555, 562 (S.D.N.Y. 2013) (collecting cases); *see also Hernandez v. Keane*, 341 F.3d 137, 146 (2d Cir. 2003) (finding no deliberate indifference where "most of th[e] delay [in receiving surgery] was caused by factors outside [the] defendants' control," and that "[t]he intervals attributable to [the] defendants are . . . reduced to a matter of months, during which [the] plaintiff was either under evaluation for surgery or under treatment for other medical conditions"); *Waller v. DuBois*, No. 16-CV-6697, 2018 WL 1605079, at *7 (S.D.N.Y. Mar. 29, 2018) (dismissing deliberate indifference claim because "the alleged delay in scheduling surgery was minimal," and "[d]uring this time, [the] [p]laintiff's doctors were exploring other medical treatments, prescribing him medication, and allowing for [the] [p]laintiff to have access to medical care, as he claims to have been in medical . . . every other day"). Plaintiff's deliberate indifference claim based on the delay in receiving surgery is therefore dismissed.

### ii. Failure to Treat Hip Pain

Plaintiff also argues that Defendants were deliberately indifferent to his medical needs because they repeatedly "refused [him his] medication by sending him back to his cell, stating that nothing was wrong with him." (Pl.'s Mem. 8.) At the outset, the Court finds, as it did in the June 5, 2018 Opinion, (*see* Opinion 19–20), that Plaintiff has plausibly alleged an objectively

serious medical condition—namely, the "loosening of the prosthetic in his left hip" which caused "extreme pain," (SAC ¶ 16),—and thereby sufficiently meets the first prong of the Eighth Amendment analysis with respect to his allegations of denial of treatment. The Court will address the subjective prong separately with respect to each Defendant.

(a) Furco

The Court previously denied Defendants' Motion To Dismiss Plaintiff's Eighth Amendment claims against Furco based on Plaintiff's allegation that Furco evaluated Plaintiff and found "nothing wrong" with him, sent him back to his cell without medication or medical attention, and said that Plaintiff "just want[s] to sue." (Opinion 27.) The Court reasoned that Furco's comment that Plaintiff "just want[s] to sue" evinces "an ulterior motive to not treat Plaintiff, despite knowing he is in pain." (*Id.*) The Second Amended Complaint includes the same allegation, but alleges that it occurred on March 3, 2014. (SAC ¶ 3.) Defendants argue that the Court should now dismiss this claim against Furco as well because the Court "already evaluated the care on this date of March 3 rendered by Furco," and found that Plaintiff's allegations "on this date were 'implausible' because 'the [medical] note indicates that Plaintiff was observed walking and moving quickly without pain." (Defs.' Mem. 9 (quoting Opinion 28).)

Although true that the Court previously found Furco's treatment on March 3, 2014 did not reflect deliberate indifference to Plaintiff's medical needs, the Court was not evaluating his treatment that day in light of the alleged comment that Plaintiff "just wants to sue." Although the medical note from March 3, 2014 notes that Plaintiff "walks briskly" and "rises quickly," (FAC 14), Plaintiff alleges that he went to emergency sick call twice on March 3, 2014, (*see* SAC ¶¶ 2–3). The medical note for March 3, 2014 appears to correspond to Plaintiff's 1:45 a.m.

visit, when he alleges he requested to see a specialist and be given a CAT scan, requests that are recorded in the medical note. (*See* SAC ¶ 2; FAC 14.) The Second Amended Complaint alleges that Plaintiff returned to emergency sick call at 6:30 a.m., which is when he alleges that Furco told him that he "just want[s] to sue" and sent him back to his cell; no medical note was submitted for this visit. (SAC ¶ 3.) The Court's prior finding is thus still applicable to the alleged 6:30 a.m. March 3, 2014 evaluation, and "if proven true, would show that [Furco] had a culpable state of mind and that [his] choice of treatment was intentionally wrong and did not derive from sound medical judgment," *Chance*, 143 F.3d at 704; *see also Harrington v. Mid-State Corr. Facility*, No. 09-CV-85, 2010 WL 3522520, at *14 (N.D.N.Y. May 21, 2010) (explaining that the defendant's statement of "his intention not to treat [the plaintiff] at all because of his propensity to constantly file complaints" evinced another motivation aside from "medical judgment" for "failing to provide [the plaintiff] with any care at all"), *adopted by* 2010 WL 3522516 (N.D.N.Y. Sept. 2, 2010). Plaintiff's deliberate indifference claim against Furco thus survives.

### (b) Bigaud

The Court dismissed Plaintiff's claims against Bigaud in the First Amended Complaint because "Plaintiff fail[ed] to allege any deliberate indifference by Bigaud." The Court noted that although Plaintiff may have preferred different treatment during his visits with Bigaud, such as being given an MRI or provided with a cane or crutches, "that Plaintiff wanted 'a different treatment does not give rise to an Eight Amendment violation.'" (Opinion 30 (quoting *Chance*, 143 F.3d at 703).)

The Second Amended Complaint includes the same allegations stemming from Plaintiff's visits with Bigaud on March 25, March 30, and April 4, 2014. (SAC ¶¶ 8, 12, 16.) The Court

already found that none of these allegations sufficiently alleges deliberate indifference, (*id.*), and sees no reason to alter that conclusion to the extent Plaintiff's allegations are substantively identical. Plaintiff now also alleges that he saw Bigaud on several other dates. However, none of these sufficiently alleges deliberate indifference by Bigaud.

Plaintiff alleges that he "went to see Bigaud" on March 26, 2014, and that Bigaud "became upset because [P]laintiff had come back again," and that he then "wrote down the opposite of what [P]laintiff said to him on three triage papers." (SAC ¶ 10.) However, Plaintiff does not indicate what he saw Bigaud for, what he said to him, what Bigaud wrote, or how it was deliberately indifferent to Plaintiff's medical needs. This allegation therefore does not support a claim of deliberate indifference.

Plaintiff also alleges that he saw Bigaud on March 31, 2014 and told him he could not lift his leg, and requested a cane and crutches, but was denied. (SAC ¶ 13.) The medical note for that date confirms that Plaintiff reported he "can't lift [his] leg" and that he requested a cane or crutches. (FAC 17.) Even assuming Plaintiff's request for crutches or a cane was denied, the medical note reflects that he was prescribed Motrin for his pain and scheduled for an "ORT" appointment on April 3, 2014, (*see id.*), and the Second Amended Complaint indeed alleges that Plaintiff "was seen by specialist Holder" on April 3, 2014, (SAC ¶ 14). Although Plaintiff may have preferred a different treatment, that does not make the treatment he received constitutionally deficient. *See Wandell v. Koenigsmann*, No. 99-CV-8652, 2000 WL 1036030, at *4 (S.D.N.Y. July 27, 2000) (collecting cases holding that "[w]hether an injured prisoner should be provided crutches is a medical judgment as to the appropriate course of treatment, and disagreement with that decision is not actionable under the Eighth Amendment"); *Veloz v. New York*, 35 F. Supp. 2d 305, 307, 312 (S.D.N.Y. 1999) (dismissing allegations that a doctor did not

prescribe the plaintiff a wheelchair, crutches, or a cane after a foot operation as insufficiently serious); *Johnson v. Dep't of Corr.*, No. 93-CV-8365, 1994 WL 665934, at *4 (S.D.N.Y. Nov. 28, 1994) (dismissing Eighth Amendment claim that the pain medicine the plaintiff received "was insufficient and ineffective" because the plaintiff "had no right to his preferred treatment"). This new allegation therefore does not plausibly allege that Bigaud was deliberately indifferent to Plaintiff's medical needs. *See Chance*, 143 F.3d at 703.

Plaintiff also includes new allegations regarding his visit with Bigaud on April 4, 2014, alleging that Bigaud informed him that Dr. Holder's examination the previous day showed that he had "loosening of the prosthetic in his left hip," and that Plaintiff asked to be admitted into the facilities hospital or provided with a cane, but was denied. (SAC ¶ 16.) However, the medical note from that date shows that, as recommended by Dr. Holder, Bigaud or another medical employee ordered a bone scan and recommended labs. (*See* Pl.'s Orig. Mem. of Law in Opp'n to Defs.' Mot. To Dismiss ("Pl.'s Orig. Mem.") Ex. B, at 3 (Dkt. No. 69).) The fact that Plaintiff sought a different treatment does not make Bigaud's conduct an Eighth Amendment violation. *See Joyner v. Greiner*, 195 F. Supp. 2d 500, 504 (S.D.N.Y. 2002) ("The fact that [the] plaintiff wanted a[] [specific procedure] done does not mean that the doctor who refused to order one was deliberately indifferent to his medical needs.").

Because none of the allegations against Bigaud plausibly plead deliberate indifference to Plaintiff's medical needs, Plaintiff's Eighth Amendment claim against Bigaud is dismissed.

### (c) Gage

The Court previously dismissed Plaintiff's Eighth Amendment claims against Gage based on his visits with Plaintiff on April 16 and 17, 2014, because Plaintiff's medical documents demonstrated that Gage was not deliberately indifferent to Plaintiff's medical needs on the dates

he saw Plaintiff, and that Plaintiff at most alleged a "disagreement over the proper treatment, which does not raise a claim under the Eighth Amendment." (Opinion 32–33 (citation and quotation marks omitted).)

Plaintiff includes the same allegation in the Second Amended Complaint that on April 16, 2014, Gage argued with Plaintiff about coming to emergency sick call so often and instructed Officer Sullivan to write a misbehavior report for Plaintiff, which Sullivan allegedly refused to do. (SAC ¶ 23.) The Court previously found that the medical notes Plaintiff submitted reflect that Gage performed an evaluation and found that Plaintiff "was without pain or complaint" during the examination and was able to "walk and maneuver without difficulty," and that Gage was therefore not deliberately indifferent for determining that Plaintiff was likely faking the severe pain he reported immediately afterwards. (Opinion 30–31.) Plaintiff adds no allegations that would alter that result; therefore the Court again finds this allegation does not plausibly state a claim for deliberate indifference. *See Simpson v. Town of Warwick Police Dep't*, 159 F. Supp. 3d 419, 446 (S.D.N.Y. 2016) (finding no deliberate indifference where his injury was "not visible" to defendants and they "believed he was faking his injury"); *McClinton v. Connolly*, No. 13-CV-2375, 2014 WL 5020593, at *5 (S.D.N.Y. Oct. 8, 2014) ("If the officers believed [the] [p]laintiff's asthma attack was a mere ruse, they could not have been aware of a substantial risk that [the] [p]laintiff would suffer serious harm.").

The Court also previously addressed Plaintiff's allegation that on April 17, 2014, Plaintiff returned to sick call and vomited, and that Plaintiff was returned to his cell, (Opinion 32), which Plaintiff includes in the Second Amended Complaint, (SAC ¶ 25). The Court found that medical documentation showed Plaintiff was sent back to his cell because "he was loud and argumentative and would not let [Gage] examine him, and he was not taking his medications,"

and noted that Gage nonetheless told Plaintiff to return to emergency sick call later. (Opinion 32 (alteration and quotation marks omitted) (citing FAC 24–25, 34).) The Court thus found that the allegation did not demonstrate deliberate indifference, and Plaintiff has not raised any new fact that would disturb that finding.

Plaintiff now adds a new allegation that he returned to see Gage on April 17, 2014 at 11:45 a.m., but that Gage "refused to see him." (SAC ¶ 27.) However, Plaintiff also alleges that Gage "order[ed] [P]laintiff to be placed on strict bed-rest as well as keeplock status." (*Id.*) Medical notes for this visit also reflect that Plaintiff was given pain medication. (FAC 25.) Plaintiff was therefore seen, evaluated, and treated. The fact that he was treated by someone other than Gage does not mean that Gage was deliberately indifferent to Plaintiff's medical needs.

Plaintiff also alleges that on the same day, he received a visit from his family, and "was made to walk to the facility visitroom, which is approximately a half-mile walk with . . . numerous stairs . . . , in extreme pain without crutches, cane[,] or facility bus pass." (SAC ¶ 28.) However, he does not specify who "made" him do so; this allegation therefore cannot state a claim against any Defendant. Plaintiff does allege that while on the visit, Plaintiff asked Johnson to be admitted to the hospital, but that Gage "became u[p]set" that Plaintiff spoke to Johnson about this and "had [P]laintiff admitted to a Keeplock isolation hospital room with no property, phones, TV, and heavily medicated to the point that [P]laintiff had no idea as to where he was for a total of twenty days." (SAC ¶ 29.) The medical records submitted by Plaintiff indicate that he was in fact discharged from the hospital on April 29, 2014, ten days after he was admitted. (FAC 34.) During this time, as Plaintiff himself alleges, Plaintiff "went on an outside trip and underwent a [b]one sc[an]." (SAC ¶ 32; FAC 34.) Nothing about Plaintiff's allegation

establishes that Gage was deliberately indifferent to his medical needs; recommending medical keeplock is not in and of itself deliberate indifference, and the medical notes submitted note that Plaintiff was placed on medical keeplock "to insure his safety." (FAC 34.)[6] *See Delisser v. Goord*, No. 02-CV-73, 2003 WL 133271, at *6 (N.D.N.Y. Jan. 15, 2003) (dismissing deliberate indifference claim where the plaintiff was "placed in medical keeplock," noting that there is "nothing in the record which shows that the defendants knew of and disregarded an excessive risk to [the plaintiff's] health or safety" by doing so). To the extent Plaintiff seeks to assert a claim based on his treatment while in the hospital, he does not allege that it was rendered by Gage.

Plaintiff's claims against Gage for deliberate indifference to his medical needs therefore fail.

### (d) Adeknami

The Court dismissed all claims against Adeknami in the First Amended Complaint for failure to allege Adeknami's personal involvement in any constitutional violations. (Opinion 14–17.) Adeknami's name did not appear in the First Amended Complaint, and the Court rejected Plaintiff's assertion in his opposition to Defendants' Motion that Adeknami is the "John Doe" referenced throughout the complaint, noting that "[i]f Plaintiff wishes to pursue these claims, he must allege specifically what actions Adeknami took, and on which dates, in the body of an amended complaint." (*Id.* at 16–17.)

Plaintiff's Second Amended Complaint adds several specific allegations against Adeknami. Plaintiff alleges he was first treated by Adeknami on March 21, 2014, when

---

[6] The Court separately addresses whether Plaintiff's placement in keeplock states a First Amendment retaliation claim below.

Adeknami gave him 200 milligrams of ibuprofen for his pain. (SAC ¶ 7.) Plaintiff also alleges that he went to emergency sick call on April 4, 2014 at 6:35 a.m. and that Adeknami sent him back to his cell "and stated that nothing was wrong with him." (*Id.* ¶ 15.) However, the medical note for April 4, 2014 at 6:35 a.m. reflects that Plaintiff was seen and evaluated, that it was observed that he was ambulatory but with "great difficulty," and that he was given a "call out" to see Bigaud the same day, (FAC 17), and the Second Amended Complaint confirms that he indeed went to the clinic at 10:10 a.m. the same day and was seen by Bigaud, (SAC ¶ 16). Plaintiff next encountered Adeknami during a sick call visit on April 13, 2014, when Adeknami notified Dr. Slam that Plaintiff was in pain and had a fever, gave Plaintiff 500 milligrams of Robaxin, and scheduled a visit for him to see Muthra. (SAC ¶ 19.) Plaintiff then alleges he returned to sick call the next day, April 14, 2014, but that he "was sent back to his cell with no medical attention provided by Adeknami." (*Id.* ¶ 20.) However, medical documents show that Plaintiff was seen twice on April 14, 2014. (*See* FAC 19–20.) During his first visit, he was evaluated and it was observed that he was "ambulating without complications." (*Id.* at 19.) He was then seen again at 7:08 a.m., evaluated, and given an appointment to see Muthra. (*Id.* at 20.) The notes also indicate that Plaintiff was using a cane to walk, contradicting Plaintiff's allegations that he was consistently denied use of a cane. (*Id.*) On April 15, 2014, Plaintiff alleges that Adeknami determined Plaintiff had a high fever with a blood pressure reading of 145/80, and that Adeknami called Gage at home, who instructed Adeknami to write out a Psych consult, give Plaintiff Naprosyn, and returned him to his housing unit without crutches or a cane. (SAC ¶¶ 21–22.) All Plaintiff's allegations and submissions thus far demonstrate that Adeknami diligently provided Plaintiff medical care; the fact that Plaintiff may have sought different

treatment than he received is insufficient to establish deliberate indifference. *Chance*, 143 F.3d at 703.

As discussed, Plaintiff also alleges that on May 2, 2014 he went to emergency sick call and asked about the status of his bone scan, and that Adeknami "could not tell [P]laintiff anything about his [b]one sc[an], and did not provide[] any medical assistan[ce] and sent [P]laintiff back to his cell." (SAC ¶ 33.) The medical notes from that date confirm that Plaintiff sought a status update regarding his bone scan, (FAC 26); however, as discussed, Plaintiff's bone scan results were not available until May 5, 2014. Additionally, the medical notes made that day indicate that Plaintiff was evaluated by Muthra, that he was "ambulatory," that he was issued a "shower pass," and that a follow up appointment was scheduled for May 15, 2014. (*Id.*) Plaintiff thus received adequate medical attention that day. Plaintiff also alleges that on May 5, 2014, Plaintiff went to emergency sick call complaining of extreme pain, but that Adeknami "did not provide any form of medical assistance but gave [P]laintiff a slip to see his medical provider." (SAC ¶ 34.) Adeknami's referral to Plaintiff's medical provider is not an act of deliberate indifference; indeed, Plaintiff was seen again the very next day by Adeknami, who contacted Dr. Slam at home, administered 500 milligrams of Robaxin to Plaintiff, and provided a slip for Plaintiff to see his medical provider later that morning. (*Id.* ¶ 35.) These incidents therefore do not give rise to an Eighth Amendment claim.

Plaintiff also alleges that during his time "in isolation," Adeknami "was the late night facility nurse on hand," and that he "refused to provide [P]laintiff[] with any form of pain medication even though [P]laintiff informed him that he was in extreme pain and call[ed] for help in the infirmary." (*Id.* ¶ 31.) Plaintiff does not indicate what reason, if any, Adeknami gave for denying Plaintiff pain medication, nor does Plaintiff specify whether he was denied pain

medication for his entire stay at the hospital or merely on one occasion. Plaintiff's memorandum only further confuses the issue, as Plaintiff alleges that Adeknami "also failed to provide [P]laintiff with medical treatment on May 2, 2014, while in the facilities isolation room when [P]laintiff complained of extreme hip pain," (Pl.'s Mem. 6); however, Plaintiff's submitted medical records, and his allegations in the Second Amended Complaint, confirm that by May 2, 2014 he had already returned from the hospital and in fact saw Adeknami at emergency sick call, (SAC ¶ 33; FAC 26). Furthermore, the medical documentation Plaintiff submitted indicates that on May 2, 2014 he was seen and evaluated, and that Adeknami discussed Plaintiff's bone scan with him but did not yet have the results to give him. (FAC 26.) "[W]here [the] plaintiff's own pleadings are internally inconsistent, a court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true in deciding a motion to dismiss." *Carson Optical Inc. v. eBay Inc.*, 202 F. Supp. 3d 247, 255 (E.D.N.Y. 2016) (quotation marks omitted); *see also U.S. Bank Nat. Ass'n v. Bank of Am., N.A.*, No. 12-CV-4873, 2012 WL 6136017, at *7 (S.D.N.Y. Dec. 11, 2012) (same); *Fisk v. Letterman*, 401 F. Supp. 2d 362, 368 (S.D.N.Y. 2005) ("The Court . . . is not obliged to reconcile plaintiff's own pleadings that are contradicted by other matters asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint." (citation omitted)). Given the vague and inconsistent nature of Plaintiff's allegations, the Court declines to infer that Adeknami was aware of and deliberately disregarded a substantial risk to Plaintiff sufficient to state an Eighth Amendment claim during his time in isolation, particularly here where Plaintiff's more specific allegation of Adeknami's May 2, 2014 conduct in his memorandum, (Pl.'s Mem. 6), contradicts the Second Amended Complaint's far more general assertion that Adeknami refused to provide pain medication "[d]uring [P]laintiff's time in isolation," (SAC ¶ 31). *See Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d

Cir.1995) (affirming dismissal of a complaint where "attenuated allegations" supporting claim were "contradicted . . . by more specific allegations in the [c]omplaint"); *Carson Optical Inc.*, 202 F. Supp. 3d at 255 (dismissing claim where the plaintiff's "generalized allegation . . . is undercut by [the] plaintiff's far more specific allegation"). Therefore, Plaintiff's Eighth Amendment claim against Adeknami fails.

## 2. Retaliation Claim

Construing the Amended Complaint liberally, and taking into consideration the arguments included in Plaintiff's memorandum, Plaintiff alleges that Gage violated Plaintiff's rights under the First Amendment by retaliating against him for seeking medical treatment. (Pl.'s Mem. 6–7.) Specifically, Plaintiff alleges that Gage placed Plaintiff on keeplock status, where he was in an isolation hospital room "with no property, phone, TV, and heavily medicated to the point that [P]laintiff had no idea as to where he was for a total of twenty days," because Gage was "u[p]set because [P]laintiff had spoken to Sgt. Johnson about being admitted to the hospital." (SAC ¶ 29.) Plaintiff also alleges that Gage filed false misbehavior reports against him, and that Thayer found Plaintiff guilty at the resulting disciplinary hearing because "Gage is someone important," implying that Gage influenced the outcome of his hearing. (SAC ¶¶ 24, 30, 38.)

### a. Applicable Law

"To succeed on a First Amendment retaliation claim, a party must show: (1) he has an interest protected by the First Amendment; (2) [the] defendants' actions were motivated or substantially caused by his exercise of that right; and (3) [the] defendants' actions effectively chilled the exercise of his First Amendment right." *Randle v. Alexander*, 960 F. Supp. 2d 457, 482 (S.D.N.Y. 2013) (citation omitted). "As the Second Circuit has repeatedly cautioned,

however, such claims are easily recited and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims 'with skepticism and particular care.'" *Webster v. Fischer*, 694 F. Supp. 2d 163, 182 (N.D.N.Y. 2010) (quoting *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001)), *aff'd*, 398 F. App'x 683 (2d Cir. 2010).

### b.  Application to Plaintiff's Claims

Plaintiff alleges that Gage argued with him because of his "continued complaints" and his "coming to emergency sick call so much," and that Gage issued a misbehavior report on April 16, 2014 and placed Plaintiff on Keeplock status.  (SAC ¶¶ 23–24.)  Plaintiff alleges he received another misbehavior report written by Gage on April 19, 2014 because he asked Sgt. Johnson to admit him to the hospital.  (*Id.* ¶ 30.)  At a hearing on the misbehavior reports, Plaintiff asserts he was "found guilty of all charges," and "sanctioned to 30 days loss of Packages, Commissary, and Phones."  (SAC ¶ 38.)  Finally, Plaintiff asserts that he was placed on medical keeplock in retaliation for seeking medical treatment, where he was kept in isolation "with no property, phones, TV, and heavily medicated," and left without "clothing, pain medication, cane, crutches, or any essential necessities."  (SAC ¶¶ 29, 32.)

"The court has found no Supreme Court authority as to whether the First Amendment confers upon a prisoner the right to demand necessary medical attention and courts in the Second Circuit have not decided the issue."  *Brown v .White*, No. 08-CV-200, 2010 WL 985184, at *12 (N.D.N.Y. Mar. 15, 2010); *see also Ross v. Koenigsmann*, No. 14-CV-1321, 2016 WL 11480164, at *17 (N.D.N.Y. Sept. 8, 2016) ("[I]t appears uncertain whether an inmate's request for medical attention is protected conduct under the First Amendment."), *adopted by* 2016 WL 5408163 (N.D.N.Y. Sept. 28, 2016).  Courts faced with such claims have often assumed, without

deciding, that seeking medical attention is protected by the First Amendment for purposes of their analysis of such claims. *See, e.g.*, *Brown*, 2010 WL 985184, at *13 ("We will assume, for the purpose of the motion for summary judgment with respect to a retaliation claim, that the First Amendment recognizes an inmate's right to demand necessary medical care or complain about inadequate care."); *Maxwell v. City of New York*, 272 F. Supp. 2d 285, 299–300 (S.D.N.Y. 2003) (noting that "one court in this district held that although doubtful that a prisoner has a protected interest in repeatedly complaining about medical ailments, the protected nature of a right to seek basic medical treatment is assumed"), *aff'd in part, vacated in part*, 380 F.3d 106 (2d Cir. 2004); *Benitez v. Pecenco*, No. 92-CV-7670, 1995 WL 444352, at *5 (S.D.N.Y. July 27, 1995) ("While I do not believe that an inmate has a constitutional right to 'repeatedly' complain about his medical ailments, I need not reach that question, for I will assume for purposes of this motion that a substantive constitutional right has been implicated." (citation omitted)); *see also West v. McCaughtry*, 971 F. Supp. 1272, 1277 (E.D. Wisc. 1997) ("If a prisoner were disciplined solely because of his requests for proper medical treatment, it would surely be a constitutional violation.").

At least one court has granted qualified immunity for a First Amendment claim based on retaliation for seeking medical treatment. *See Ross*, 2016 WL 11480164, at *18 (holding that a defendant "is entitled to summary judgment on the grounds of qualified immunity because there is no 'clearly established right' under the First Amendment for inmates to request medical attention"). However, Defendants did not raise a qualified immunity defense in their memoranda. *Whitley v. Bowden*, No. 17-CV-3564, 2018 WL 2170313, at *12 (S.D.N.Y. May 10, 2018) (declining to consider qualified immunity defense "because it is 'not sufficiently argued' by [the] [d]efendants, who are represented by counsel and attempting to dismiss a pro se

[c]omplaint" (quotation marks omitted) (citing *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir 1998))).

Because this issue is undecided in the Second Circuit, the Court denies Defendants' Motion without prejudice and grants Defendants leave to move for dismissal of this claim on the basis of qualified immunity.

### III. Conclusion

For the foregoing reasons, Defendants' Motion To Dismiss is granted in part and denied in part. The Eighth Amendment claims against Gage, Adeknami, and Bigaud are dismissed. Because this is the second adjudication of Plaintiff's claims on the merits and further amendment would be futile, the dismissal is with prejudice. *Melvin v. County of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at *24 n.19 (S.D.N.Y. Mar. 29, 2016) (dismissing claims with prejudice because the plaintiff "has already had two bites at the apple, and they have proven fruitless" (citation, alterations, and quotation marks omitted)); *Al-Qadaffi v. Servs. for the Underserved (SUS)*, No. 13-CV-8193, 2015 WL 585801, at *8 (S.D.N.Y. Jan. 30, 2015) (denying leave to amend where the plaintiff "has already had one chance to amend his [c]omplaint, and there is still no indication that a valid claim might be stated if given a second chance"), *aff'd*, 632 F. App'x 31 (2d Cir. 2016). The Eighth Amendment claims against Furco, the First Amendment claim against Gage, and the Due Process claim against Thayer remain. Defendants may renew their Motion To Dismiss the First Amendment claim on grounds of qualified immunity within 30 days of this Opinion.

The Clerk of the Court is respectfully requested to terminate the pending motion, (Dkt. No. 90), terminate Defendants Bigaud and Adeknami from the docket, and to mail a copy of this Opinion to Plaintiff.

SO ORDERED.

Dated: March 29, 2019
       White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE